DENNIS WALDON STOCKTON

V.

COMMONWEALTH OF VIRGINIA

Record No. 901320

March 1, 1991

Present: All the Justices

*Karen I. Meyer; Barry L. Johnson (William E. Cook, Jr.; Carolyn M. Landever; Kevin L. Anderson; Kathy Gear Owens; Arnold & Porter*, on briefs), for appellant.

*Virginia B. Theisen, Assistant Attorney General (Mary Sue Terry, Attorney General; John H. McLees, Jr., Assistant Attorney General*, on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

On March 23, 1983, a jury in the Circuit Court of Patrick County convicted Dennis Waldon Stockton of murder for hire and fixed his punishment at death. The trial court imposed the death penalty, and this Court affirmed both the conviction and the sentence. *Stockton v. Commonwealth*, 227 Va. 124, 314 S.E.2d 371 (1984) (*Stockton I*). The Supreme Court of the United States denied certiorari. *Stockton v. Virginia*, 469 U.S. 873 (1984).

On June 18, 1987, the United States District Court for the Western District of Virginia found that Stockton had been denied a fair trial. This finding was based upon a prejudicial remark made by a third party in the presence of jurors during a luncheon recess in the sentencing phase of Stockton's trial. The district judge granted Stockton a writ of habeas corpus and ordered that he either be given a new sentencing hearing or sentenced to life imprisonment. *Stockton v. Virginia*, Civil Action No. 86-0106-D (W.D.Va. 1987). This order was affirmed on appeal, *Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988), and the Supreme Court denied certiorari, *Virginia v. Stockton*, 489 U.S. 1071 (1989).

Upon return of the case to the Circuit Court of Patrick County, the court granted a change of venue and ordered that the new sentencing hearing be conducted in the Circuit Court of the City of Newport News. A jury in that court heard evidence both in aggravation and in mitigation and fixed Stockton's penalty at death. On July 30, 1990, the trial judge imposed the death penalty, and the matter is here for automatic sentence review pursuant to Code § 17-110.1.

At the new sentencing hearing, the trial court informed prospective jurors that Stockton earlier had been found guilty of murder for hire and that the function of the new jury would be to determine an appropriate sentence for the defendant. Over Stockton's objection, a transcript of the testimony given during the guilt phase of Stockton's original trial was read to the jury.

In brief, the testimony showed that in June of 1978, Stockton overheard Tommy McBride offer Randy Bowman $1,500 to kill Kenneth Arnder because of the latter's failure to pay McBride for drugs he had purchased. Stockton said he needed money and would kill Arnder for McBride.

Arnder's mother last saw Kenneth alive on July 20, 1978, when he left her home with Stockton en route to Kibler Valley in Patrick County. On July 25, Kenneth Arnder's body was found in a remote area of Surry County, North Carolina. Arnder had been shot once between the eyes, and both his hands had been severed above the wrists.

Stockton admitted on at least three occasions that he killed Arnder. For example, in an admission to a cellmate during a period of confinement in 1980, Stockton stated that he killed Arnder because the latter "had ripped somebody off for some drugs," that he had been hired to kill Arnder, and that the killing occurred at Kibler Valley in Patrick County, Virginia. Later, Stockton and the same cellmate "got in a fight." Stockton said "he'd cut Arnder's hands off and he'd do [the cellmate] the same way."

## I.  *Shackling of Stockton*

Prior to the start of jury selection, Stockton was brought into the courtroom shackled around his ankles. Defense counsel told the trial court that he "thought Mr. Stockton was going to be unshackled." When the sheriff stated he had been told Stockton "was an escape risk and security risk," the trial judge refused to order the shackles removed.

After the luncheon recess, defense counsel informed the court that Stockton wished to remain in jail during the remainder of jury selection. Stockton was brought to the courtroom so he could discuss the issue with the court. He complained, among other things, about having to appear before the jury in shackles. During the discussion, he stated he wanted to discharge his counsel and represent himself. When the trial court indicated disapproval, Stockton called the judge a "crook" and a "vile son-of-a-bitch." The judge then ordered Stockton removed from the courtroom.

Thereafter, Stockton refused to return to the courtroom unless allowed to appear unshackled. The trial judge repeatedly told defense counsel that Stockton would be allowed to return if he agreed to conduct himself properly. On the second day following his removal, he was allowed to return to the courtroom, and he apparently remained unshackled for the remainder of the resentencing hearing.

Citing *Illinois* v. *Allen*, 397 U.S. 337 (1970), Stockton contends his appearance in shackles was inherently prejudicial to his constitutional right to a fair and impartial jury.[1] The shackling was especially prejudicial during his sentencing hearing, Stockton asserts, since the jurors would be required to determine whether he posed a future danger to society, and the trial court's refusal to order the shackles removed "was tantamount to a declaration . . . of [the court's] belief that Stockton did pose such a danger." Accordingly, Stockton says, his shackling in front of prospective jurors was prejudicial error requiring a new sentencing proceeding.

■ We disagree with Stockton. The basic reason for our disagreement is that " 'a trial judge's decision to shackle a defendant is not per se unconstitutional.' " *Jones* v. *Meyer*, 899 F.2d 883, 884 (9th Cir. 1990) (quoting *Spain* v. *Rushen*, 883 F.2d 712, 716 (9th Cir. 1989)). "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Allen*, 397 U.S. at 343.

■ Further basis for our disagreement with Stockton is found in *Frye* v. *Commonwealth*, 231 Va. 370, 345 S.E.2d 267 (1986). There, on trial for the capital murder of a law enforcement officer,

---

[1] It is not at all clear that the jurors observed the shackles. The trial judge remarked that he could see the shackles "under the [counsel] table," but he made no comment about the jurors' ability to see them. For purposes of discussion, we will assume the shackles were visible to the jury.

Frye was "restrained by chains or handcuffs . . . visible to the jury." *Id.* at 381, 345 S.E.2d at 276. He argued that being so restrained prejudiced him before the jury.

In rejecting Frye's argument, we said:

> While we agree that requiring a defendant to stand trial in physical restraints may create prejudice in the minds of jurors by suggesting that the defendant is dangerous or that his guilt is a foregone conclusion, we also believe that in extraordinary cases such shackling of the defendant is necessary to protect the rights of those present in the courtroom and society at large.
>
> . . . .
>
> A trial court may consider various factors in determining whether a defendant should be restrained, such as the seriousness of the charge, the defendant's temperament, age, and physical attributes, his criminal record, and any past escapes, escape attempts, or threatened misconduct. This determination need not be made upon a formal hearing, and the information upon which it is based need not be evidence formally offered and admitted at trial.

*Id.* at 381-82, 345 S.E.2d at 276 (citations omitted).

■ This rationale applies with equal force here. Indeed, considering that Stockton stood before the court already convicted of a capital offense, he had an enhanced motive to attempt an escape and, in the process, to injure anyone who stood in his way, be they court officials or spectators. Hence, there was more reason to restrain him. His offense was grave, he had a propensity for violent crime, and he had a record of escape. He also had previously cursed and made disparaging remarks about the trial judge. In short, this was one of those "extraordinary cases [where] shackling of the defendant is necessary to protect the rights of those present in the courtroom and society at large." *Id.* at 381, 345 S.E.2d at 276.

## II.  *Refusal to Exclude Prospective Juror for Cause*

Stockton contends that the trial court erred in refusing to exclude for cause prospective juror William H. Savage. On voir dire, Savage stated that, two years earlier, his grandson had been shot and killed and that the killers had not been apprehended. Savage

also said that he belonged to a group called "Family and Friends Against Crime Today," which was formed by Savage's wife and daughter to publicize the murders of the grandson and other young victims so the group could "solve some of these murders." When asked if he would like to see his grandson's killers executed, Savage replied in the affirmative.

Stockton says that Savage's voir dire examination showed he was so biased and prejudiced that he was incapable of serving as an impartial juror. Hence, Stockton concludes, the trial court "committed manifest error in not excluding [Savage]."

■ We do not agree. Whether a prospective juror stands indifferent to the cause is a matter for the exercise of discretion.

> Because the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand, the trial court's exercise of judicial discretion in deciding challenges for cause will not be disturbed on appeal, unless manifest error appears in the record.

*Pope* v. *Commonwealth*, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987), *cert. denied*, 485 U.S. 1015 (1988) (citation omitted).

■ Membership in a particular organization does not per se disqualify a prospective juror. *United States* v. *Frank*, 901 F.2d 846, 849 (10th Cir. 1990) (prospective juror in sexual assault case founding member of MADD). Nor is a prospective juror per se disqualified because a family member has been a victim of violent crime. *Mackall* v. *Commonwealth*, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), *cert. denied*, 492 U.S. 925-26 (1989) (mother of prospective juror in capital murder case recent rape victim).

During voir dire, Savage indicated he had no interest in the trial or the outcome of the case, had not expressed or formed an opinion regarding the case, was not sensible of any bias or prejudice, and knew no reason why he could not give the defendant and the Commonwealth a fair trial. On the subject of life imprisonment, the record shows the following colloquy between Ms. Madonick, one of Stockton's counsel, and prospective jurors:

> MS. MADONICK: How do you feel about life imprisonment as a punishment for murder? Do you think that can be an appropriate punishment?

JUROR ALMQUIST: It could be.

MS. MADONICK: And you, Mr. Savage?

JUROR SAVAGE: I'd have to hear the case first. I couldn't give you a definite answer.

MS. MADONICK: But you would be able to consider it?

A JUROR: Yes. I do think it's a definite possibility and I do think there are cases in which that would be the sentence. I would also need to hear the information before I make a decision.

Under these circumstances, we do not think the trial court abused its discretion in refusing to exclude Savage for cause.

## III. *Denial of Self-Representation*

The judgment of the United States Court of Appeals for the Fourth Circuit, which affirmed the District Court's order awarding Stockton a new sentencing hearing, was entered July 22, 1988. On April 11, 1989, the law firm of Arnold & Porter of Washington, D.C., notified the Circuit Court of Patrick County that the firm would represent Stockton in connection with his resentencing hearing.

On April 28, 1989, Stockton filed in the Circuit Court of Patrick County a Motion for Re-Sentencing Hearing in which he stated that he thereby terminated the representation of Arnold & Porter. In an accompanying letter to the trial judge, Stockton stated that he would direct his own defense.

Citing *Faretta* v. *California*, 422 U.S. 806, 835-36 (1975), Arnold & Porter wrote the trial judge on May 17, 1989, requesting that the court hold a hearing to determine whether Stockton's waiver of his right to counsel was knowing, intelligent, and voluntary. Following a psychiatric examination of Stockton, the trial court conducted a hearing and on September 1, 1989, ruled that Stockton had knowingly, intelligently, and voluntarily waived his right to counsel. The court appointed J. Grady Monday as standby counsel and set the resentencing hearing for January 9, 1990.

Stockton filed several motions pro se, including motions for a continuance and a change of venue. Then on January 4, 1990, a member of the Arnold & Porter firm advised the trial judge that the firm represented Stockton but would need a continuance. On January 8, 1990, the day before the resentencing hearing was scheduled to begin, Stockton filed a notice stating that he had "re-

tained" Arnold & Porter to represent him. The firm's motion for a continuance as well as Stockton's motion for a change of venue were granted, and the case was scheduled for hearing in the Circuit Court of the City of Newport News on May 15, 1990.

During jury selection on May 15, Stockton told the trial judge he had no confidence in his attorneys. He said he was not "asking for a continuance, but if [his] case [went] on [he was] going to represent [himself]." Noting that he had granted Stockton's earlier request to represent himself but that Stockton later withdrew the request, the judge denied the motion. Stockton then engaged in the name-calling recited previously in this opinion, as a result of which the judge ordered him removed from the courtroom.[2] Defense counsel moved for a continuance, and the trial court denied the motion. Counsel then asked leave to withdraw from the case, and the court denied that motion.

Citing *Faretta*, Stockton contends that a criminal defendant has a right under the Sixth Amendment to waive counsel and represent himself. If the waiver is timely and made knowingly, Stockton says, the right is unconditional and self-representation must be allowed absent a finding that the request therefor is a tactic to secure delay. Stockton asserts that the trial court previously had found him competent to decide whether he wanted to represent himself, his decision was made knowingly, and his request was timely because made before "the jury had been chosen." *United States* v. *Dougherty*, 473 F.2d 1113 (D.C. Cir. 1972).

Stockton maintains that the trial court "did not articulate a rationale for rejecting [his] motion to represent himself." We find in the record, however, this express statement made by the trial judge: "I feel [Stockton] is deliberately trying to not have [the case] tried." This represents clear articulation of a finding that

---

[2] Stockton contends in a footnote to his brief that the trial court "compounded its error [of refusing self-representation] by . . . excluding [him] from the courtroom entirely." We disagree. Stockton's contemptuous conduct justified his removal from the courtroom. Then, as he was led from the courtroom, he told the trial judge: "Don't call me [back to the courtroom] no more." The judge repeatedly told defense counsel that Stockton could return to the courtroom if he agreed to conduct himself properly. Typical of the judge's remarks to counsel are these: "Mr. Stockton is welcome to come as long as he conducts himself properly, and the court certainly thinks he should be here. I hope you talked to him and advised him of the seriousness of the case and the fact that his presence is needed." So, the trial court gave Stockton the key to the courtroom, and he cannot fault the court if he did not use the key sooner.

Stockton's request for self-representation was a tactic to secure delay, and the finding is sufficient alone to justify affirmance of the trial court's refusal to permit Stockton to represent himself. *Fritz* v. *Spalding*, 682 F.2d 782, 784-85 (9th Cir. 1982).[3]

█ Furthermore, as noted *supra*, between April 1989 and May 1990, Stockton shifted back and forth in his position with respect to self-representation. At first, he wanted Arnold & Porter to represent him. Then, he decided to represent himself. Later, he changed his mind and "retained" Arnold & Porter. Lastly, he decided he wanted to represent himself. We think Stockton "forfeited his right to self-representation by his vacillating positions." *United States* v. *Bennett*, 539 F.2d 45, 51 (10th Cir.), *cert. denied*, 429 U.S. 925 (1976).

## IV.  *Admissibility of Guilt-Phase Transcript*

Stockton contends that the admission of hearsay evidence, consisting of the transcript of the testimony given at the guilt phase of his original trial, violated "the Virginia laws of evidence" as well as his "rights under both the United States and Virginia Constitutions to confront the witnesses against him." For his reference to Virginia law, Stockton cites *Burton* v. *Oldfield*, 195 Va. 544, 79 S.E.2d 660 (1954), and states that "[t]his Court has long recognized that the transcript of testimony at a former trial is hearsay and is inadmissible at a later trial unless the witnesses who gave the testimony in the former trial are unavailable."

With reference to his right of confrontation, Stockton cites *Barber* v. *Page*, 390 U.S. 719 (1968), where the Supreme Court stated:

"There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."

---

[3] Stockton also maintains that the trial court "could not permissibly have held that [his request to represent himself] was a delaying tactic" because he represented to the court he was "not asking for a continuance." We disagree. The trial court had every reason to believe the representation was not made in good faith.

390 U.S. at 721 (quoting *Pointer* v. *Texas*, 380 U.S. 400, 405 (1965)).

Stockton also cites *Ohio* v. *Roberts*, 448 U.S. 56 (1980). There, the Supreme Court said:

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, . . . the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason [for] the general rule."

*Id.* at 65 (quoting *Snyder* v. *Massachusetts*, 291 U.S. 97, 107 (1934)) (citations omitted).

Finally, Stockton cites *Fisher* v. *Commonwealth*, 217 Va. 808, 232 S.E.2d 798 (1977), where we applied the *Barber* test requiring the prosecution to show unavailability as a prerequisite to the admission of the prior testimony of an absent witness. We upheld the admission of the preliminary hearing testimony of a witness who was deceased at the time of trial. *Id.* at 813, 232 S.E.2d at 802.

Stockton says that *Barber* is "controlling." In *Barber*, the prosecution sought to introduce into evidence at the defendant's robbery trial a transcript of the preliminary hearing testimony of a witness who at the time of trial was incarcerated in another state. The Supreme Court held that admission of the transcript was error because the prosecutorial authorities had not made a good faith effort to obtain the presence of the witness at trial. 390 U.S. at 724-25.

Stockton maintains we must reach the same result here because the Commonwealth made no effort to establish the unavailability of the witnesses whose testimony it sought to introduce by transcript. "A demonstration of unavailability, however, is not al-

ways required." *Roberts*, 448 U.S. at 65 n.7. Indeed, in *Dutton v. Evans*, 400 U.S. 74, 89 (1970), the Supreme Court said that "the mission of the Confrontation Clause is to advance a *practical concern* for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" (Quoting *California v. Green*, 399 U.S. 149, 161 (1970)) (emphasis added).

■ If, in application of this "practical concern," it appears that "the utility of trial confrontation [is] . . . remote [the prosecution is not required] to produce a seemingly available witness." *Roberts*, 448 U.S. at 65 n.7. And the utility of trial confrontation is remote if "the possibility that cross-examination . . . could conceivably have shown the jury that [a prior] statement . . . might have been unreliable [is] wholly unreal." *Dutton*, 400 U.S. at 89.

■ We think this case presents the sort of situation contemplated by *Roberts* and *Dutton* and thus is not subject to the rule applied in *Barber*. The transcript in *Barber* was offered to establish the guilt of the accused. Here, Stockton's culpability had been established conclusively, and guilt was not an issue in the new sentencing hearing. Use of the transcript was appropriate for the purpose of informing the jury of the nature of the offense with which Stockton was charged and the circumstances under which it was committed. In ruling the transcript was admissible, the trial court limited its use to that purpose.

We have approved this use of transcripts of prior testimony in several previous cases where we ordered new sentencing hearings after death sentences had been declared invalid. *Fogg v. Commonwealth*, 215 Va. 164, 168, 207 S.E.2d 847, 850 (1974); *Huggins v. Commonwealth*, 213 Va. 327, 329, 191 S.E.2d 734, 736 (1972); *Hodges v. Commonwealth*, 213 Va. 316, 321, 191 S.E.2d 794, 798 (1972); *Snider v. Cox*, 212 Va. 13, 14, 181 S.E.2d 617, 618 (1971).

Stockton argues, however, that the guilt-phase transcript was used by the prosecution not only to inform the jury of the nature of the offense with which Stockton was charged and the circumstances under which it was committed but also to establish the vileness and future dangerousness predicates for imposition of the death penalty. Stockton refers us to several places in the record where, he says, the prosecutor made this allegedly improper use of the transcript.

The first instance occurred during pretrial argument on the question whether the transcript should be admitted into evidence. During this argument, the Commonwealth's Attorney stated that portions of the transcript testimony would be relevant to and probative of the issue of future dangerousness. It suffices to say that this statement was not made in the jury's presence and, hence, could not have prejudiced Stockton.

The other instances occurred during the prosecutor's closing argument where, in discussing vileness and future dangerousness, the prosecutor referred briefly to the guilt-phase transcript. As noted *supra*, the trial court limited use of the transcript to the purpose of informing the jury of the nature of the offense charged against Stockton and the circumstances under which it was committed. We think it was incumbent upon Stockton to object when the prosecutor allegedly exceeded the court's limitation. Stockton failed to object. Hence, we will not notice his argument on this point. Rule 5:25.

We find that the transcript in question is "marked with such trustworthiness that 'there is no material departure from the reason [for] the general rule.' " *Roberts*, 448 U.S. at 65. The incident which tainted Stockton's sentence did not occur during the guilt phase but during the sentencing phase of the original trial. Stockton was represented by counsel in that trial and was given, and took full advantage of, the opportunity to cross-examine the witnesses whose testimony is contained in the transcript that was read to the new sentencing jury.

Stockton argues, however, that the holding in *Barber* "did not turn on whether there was an opportunity to cross-examine the witness at the prior proceeding, but rather on the necessity of providing the 'occasion for the jury to weigh the demeanor of the witnesses.' " Stockton complains that admission of the transcript denied him the occasion for the jury in his new sentencing hearing to weigh the demeanor of the witnesses.

Stockton applies *Barber* out of context. As noted previously, the transcript in *Barber* consisted of the preliminary hearing testimony of a witness who was absent at the time of trial. The Supreme Court noted that defense counsel had failed to cross-examine the witness at the preliminary hearing. The Court held that it would reach the same result had defense counsel actually cross-examined the witness at the preliminary hearing. The Court explained:

The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.

390 U.S. at 725.[4]

■ Here, the transcript in dispute consists of testimony given, not at a preliminary hearing, but in a trial where the witnesses were cross-examined and the jury had full opportunity to "weigh the demeanor of the witness[es]." *Id.* Hence, the trustworthiness of the transcript was established beyond doubt and there was no necessity to provide a second "occasion for [a] jury to weigh the demeanor of the witness[es]." *Id.*

■ Indeed, paying full deference to the mission of the Confrontation Clause "to advance a practical concern for the accuracy of the truth-determining process," *Dutton*, 400 U.S. at 89, we think it is "wholly unreal" to say there was a possibility that cross-examination of the guilt-phase witnesses at the new sentencing hearing "could conceivably have shown . . . that the [prior testimony] might have been unreliable." *Id.* Accordingly, we hold the trial court did not err in admitting the transcript of the earlier testimony.

### V.  *Racially Discriminatory Use of Peremptory Challenges*

Citing *Batson* v. *Kentucky*, 476 U.S. 79 (1986), Stockton contends that the Commonwealth exercised its peremptory challenges in a racially discriminatory manner. Stockton points out that the Commonwealth used three of its four peremptory strikes to exclude three of the four blacks from the venire and also struck the only black among the four alternates.

At the conclusion of jury selection, Stockton moved "to have the proceeding dismissed" on the ground the Commonwealth had exercised its peremptory challenges in "a racially biased way." The trial judge then called upon the Commonwealth's Attorney to

---

[4] Continuing, the Court stated that "[w]hile there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not . . . such a case." 390 U.S. at 725-26.

state "the reason for the strikes." After the prosecutor gave his reasons, the trial judge stated that he did not "feel [the peremptory challenges] were racially motivated" and overruled Stockton's motion.

*Batson* holds that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89. A defendant makes a prima facie case of discrimination by showing "that he is a member of a cognizable racial group, . . . that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race . . . [and] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* at 96.[5]

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97. The prosecutor may not rebut the prima facie case by stating merely that he challenged jurors of the defendant's race on the assumption "they would be partial to the defendant because of their shared race." *Id.* Nor may the prosecutor rebut the prima facie case merely by denying he had a discriminatory motive or affirming his good faith in making individual selections. *Id.* at 98. "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried." *Id.*

Here, the three black prospective jurors struck by the prosecutor were Ms. Winbush, Ms. Jenkins, and Mr. Wright, and the one black alternate was Ms. Wilson. The prosecutor explained that he struck Ms. Winbush and Ms. Wilson because of their reservations about the death penalty. Stockton then limited his complaint to the two remaining prospective jurors, Ms. Jenkins and Mr. Wright. We will limit our discussion to the same two persons.

In his explanation, the prosecutor stated that in deciding to strike Ms. Jenkins, he considered her age, her educational background, her employment, and her demeanor during the course of voir dire. The prosecutor also said that he considered Ms. Jenkins'

---

[5] We will assume, without deciding, that Stockton has standing to question the Commonwealth's use of its peremptory strikes to exclude blacks. We will also assume, without deciding, that Stockton made out a prima facie case of purposeful discrimination.

suitability as a juror in comparison with "a number of other jurors who [he] felt would be preferable because of their educational background [and] their attentiveness during the course of voir dire examination." In summary, the prosecutor said Ms. Jenkins' exclusion was the result of "the process of elimination" and, among other things, his "observation of . . . her personal demeanor" during voir dire.

With respect to Mr. Wright, the prosecutor stated that he considered the age of the prospective juror who, at 67, would be the oldest member of the jury panel. The prosecutor also said he had noticed that Wright "appeared to have physical problems associated with his eye," and the prosecutor questioned whether Wright "would be attentive," given the stressful nature of the matter on trial.

Because a trial judge's findings in this context " 'turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " *Spencer* v. *Commonwealth*, 238 Va. 295, 310, 384 S.E.2d 785, 795 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1171 (1990) (quoting *Batson*, 476 U.S. at 98 n.21) (*Spencer II*). We conclude that the present case is not out of the ordinary, that the trial court's finding of racial neutrality in the prosecutor's strikes is adequately supported, and that the finding should not be disturbed on appeal.

## VI. *Admissibility Issues*

### a. *Evidence of Unadjudicated Crimes*

Stockton contends that the trial court erroneously admitted evidence of unadjudicated crimes. Specifically, Stockton complains of evidence that he killed one Ronnie Tate because Tate was "running [his] mouth" about the murder of Kenneth Arnder. Stockton says that he was "never tried for, much less convicted of, this crime," and that evidence of its commission violated his due process rights to a presumption of innocence and an unbiased jury.

In *Spencer II*, however, we pointed out that under Code § 19.2-264.4(C), a sentencing jury shall consider evidence of a defendant's "prior history" in determining whether he "would commit criminal acts of violence that would constitute a continuing serious threat to society." 238 Va. at 317, 384 S.E.2d at 798-99. We said that we have construed this provision "to permit the admission into evidence of unadjudicated misconduct," *id.* at 317,

384 S.E.2d at 799, and we cited several cases in example. *See O'Dell* v. *Commonwealth*, 234 Va. 672, 700, 364 S.E.2d 491, 504, *cert. denied*, 488 U.S. 871 (1988); *Pruett* v. *Commonwealth*, 232 Va. 266, 285, 351 S.E.2d 1, 12 (1986), *cert. denied*, 482 U.S. 931 (1987); *Watkins* v. *Commonwealth*, 229 Va. 469, 488, 331 S.E.2d 422, 436 (1985), *cert. denied*, 475 U.S. 1099 (1986).

Stockton maintains that the decisions of other states indicate that evidence of unadjudicated crimes is inadmissible, and he cites cases from Indiana, Tennessee, and Washington. Our research discloses, however, a split of authority, with Georgia, Nevada, South Carolina, and Texas permitting such evidence.[6] We reaffirm our earlier decisions and reject Stockton's contention that evidence of unadjudicated crimes is inadmissible.

Stockton argues further, however, that even if this type of evidence is admissible, Virginia's capital sentencing scheme is unconstitutional because it fails to require proof beyond a reasonable doubt of the commission of unadjudicated crimes and thus permits the jury to consider unreliable and prejudicial evidence. However, in *Beaver* v. *Commonwealth*, 232 Va. 521, 529, 352 S.E.2d 342, 347, *cert. denied*, 483 U.S. 1033 (1987), we rejected a contention that evidence of unadjudicated criminal activity is "not reliable." And in *Gray* v. *Commonwealth*, 233 Va. 313, 346-47, 356 S.E.2d 157, 175-76, *cert. denied*, 484 U.S. 873 (1987), we rejected an argument that such evidence is "highly inflammatory and inherently prejudicial."

### b.  *Evidence of Innocence*

Stockton contends the trial court erred in refusing to allow admission of evidence and to permit argument suggesting that he did not murder Kenneth Arnder. Stockton says that "[p]reventing the sentencing jury from obtaining this critical information violated notions of fundamental fairness . . . and constituted a violation of the Eighth and Fourteenth Amendments . . . and the companion provisions of the Virginia Constitution." The disputed evidence, Stockton submits, was material to the issues of vileness and future

[6] *Fair* v. *State*, 245 Ga. 868, 870-71, 268 S.E.2d 316, 319-20, *cert. denied*, 449 U.S. 986 (1980); *Crump* v. *State*, 102 Nev. 158, 161, 716 P.2d 1387, 1388-89, *cert. denied*, 479 U.S. 871 (1986); *State* v. *Skipper*, 285 S.C. 42, 48, 328 S.E.2d 58, 62 (1985), *rev'd on other grounds*, 476 U.S. 1 (1986); *Milton* v. *State*, 599 S.W.2d 824, 827 (Tex. Crim. App. 1980) (en banc), *cert. denied*, 451 U.S. 1031 (1981).

dangerousness and "relevant to establishing 'residual doubt' as mitigating evidence in sentencing."

The trial court excluded the proffered evidence on the ground that Stockton's guilt had "already been decided." In reaching this conclusion, the trial court cited *Franklin* v. *Lynaugh*, 487 U.S. 164 (1988), and *Frye, supra.*

In *Franklin*, the defendant argued that he was entitled as a matter of constitutional right to an instruction telling his sentencing jury that it could consider residual doubt as a basis for mitigation. Rejecting this argument, the Court stated that its prior decisions did not "suggest that capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase" of a capital penalty trial. *Id.* at 173 (emphasis in original). The Court said further that permitting consideration of residual doubt in the penalty phase "is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentence—but not the underlying conviction—is struck down on appeal." *Id.* at 173 n.6.

In *Frye*, the defendant argued in the trial court that the jury in the sentencing phase of his capital murder trial" should consider the . . . possibility that additional evidence might later demonstrate Frye's innocence of the crime for which it had convicted him." 231 Va. at 393, 345 S.E.2d at 283. The trial court ruled the argument impermissible.

We affirmed, stating that "the trial court would have been remiss if it had permitted defense counsel" to argue that the jury's verdict "was wrong, that the Commonwealth had failed to prove its case against Frye." *Id.* We stated further that "[t]he issue of guilt had been resolved in the first phase of the trial and could not properly be raised again in the penalty phase." *Id.* at 393-94, 345 S.E.2d at 283.

If, as *Franklin* holds, a defendant is not entitled to an instruction permitting a sentencing jury to consider residual doubt and if, as *Frye* teaches, a defendant may not argue residual doubt in the sentencing phase, it follows that the trial court did not err in refusing to admit evidence and to allow argument on the subject. Hence, we reject Stockton's contention.

## VII.  *Aggravating Factors*

Code § 19.2-264.2 provides that the death penalty may not be imposed unless the court or jury shall find one or both of two ag-

gravating factors: First, "that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society," termed "future dangerousness" in our opinions. Second, "that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim," referred to in our opinions as "vileness." Here, the jury found the existence of both predicates, but based its finding of vileness upon the aggravated battery component alone.

Stockton argues that the evidence does not support a finding of either future dangerousness or vileness. We disagree.

With respect to future dangerousness, the evidence shows that Stockton had a long record of felony convictions, including three convictions for discharging a firearm into an occupied building, one conviction for escape,[7] two convictions for unlawful possession of firearms, and one burglary conviction. In addition, according to his own admissions to police authorities, Stockton had been hired to kill five people other than Kenneth Arnder, had committed arson for hire, and had stolen a large number of firearms in a breaking and entering.

Then there are the frightening prospects revealed in Stockton's hired murder of Kenneth Arnder, where the victim was shot and dismembered, and in its aftermath, where Ronnie Tate was killed because he was "running [his] mouth" about Ardner's murder. Added to all this is the testimony given at the new sentencing hearing by Dr. Miller Ryans, a psychiatrist at Central State Hospital, who stated that Stockton "presents a continuing serious threat to society."[8]

---

[7] Stockton argues that the trial court erred in allowing the Commonwealth to introduce his conviction for escape without showing that the escape was from a road gang rather than a correctional facility. We find this argument frivolous, typical of several Stockton makes. In the first place, other than defense counsel's statement on brief, nothing establishes the situs of the escape. Second, if the escape did occur from a road gang, the defense could have brought this fact to the jury's attention. Third, so far as the outcome of this case is concerned, whether the escape was from a road gang or a correctional facility should make no difference.

[8] On cross-examination, Dr. Ryans admitted that Stockton would not "pose a future continuing serious threat of violence to either himself or to others" if he "continues to be incarcerated in the Virginia correctional system." Stockton then cites *Giarratano v. Commonwealth*, 220 Va. 1064, 1076, 266 S.E.2d 94, 101 (1980) where, he says, we "specifically considered the future dangerousness of a party *while incarcerated*" in determining

As noted previously, the jury based its finding of vileness upon the component of aggravated battery. We have defined aggravated battery as one which, "qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *M. Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

Stockton argues that the evidence was insufficient to sustain the jury's finding of vileness because the Commonwealth offered no evidence that Arnder's hands were cut off before he suffered the gunshot wound to his head. Stockton quotes *Jones* v. *Commonwealth*, 228 Va. 427, 448, 323 S.E.2d 554, 565 (1984), *cert. denied*, 472 U.S. 1012 (1985), where we said that aggravated battery connotes "conduct preceding death of the victim."

What we actually said in *Jones* was that aggravated battery "*ordinarily* connote[s] conduct preceding death of the victim." *Id.* (emphasis added). We do not think, however, that this is an ordinary situation.

Dr. Page Hudson, who was North Carolina's chief medical examiner at the time of the Arnder murder, testified that he was present when an autopsy was conducted on Arnder's body. He said that the gunshot wound to Arnder's head was the "probable" cause of death, that Arnder would have "become immediately unconscious," and that death would have "followed shortly thereafter." Dr. Hudson testified further, however, that the wounds to Arnder's hands would "easily have been fatal" if untreated.

In *Barnes* v. *Commonwealth*, 234 Va. 130, 360 S.E.2d 196 (1987), *cert. denied*, 484 U.S. 1036 (1988), addressing the subject of aggravated battery, we said that the Commonwealth is not required to prove the order of infliction of multiple wounds to establish which causes death, provided death does not result instantaneously from the first wound. 234 Va. at 139-40, 360 S.E.2d

the appropriateness of a death sentence. (Emphasis in original.) Stockton then argues that "[t]he sentencing court should have focused only on Stockton's conduct while incarcerated." This is another example of Stockton's frivolous arguments. In *Giarratano*, we cited the opinion of the same Dr. Ryans that Giarratano, while incarcerated, "would constitute a homicidal threat to himself and to the prison population." *Id.* But the trial court did not, and we certainly did not, focus "only on [Giarratano's] conduct while incarcerated" to paraphrase Stockton's words. Indeed, we cited other testimony of Dr. Ryans that " 'it is probable that [Giarratano] if he were to be released would continue to present a threat to society.' " *Id.* And we quoted the testimony of another psychiatrist that "if [Giarratano] was to be 'at large in the community' in the future, [he] had the 'potential' for violence." *Id.* at 1077, 266 S.E.2d at 102.

at 203. And in *Gray, supra,* we held that aggravated battery was established by showing the victim received six gunshot wounds, any one of which would have proved fatal, in rapid succession. 233 Va. at 341, 356 S.E.2d at 173. Further, "[f]or purposes of the 'vileness' determination, it is immaterial whether the decedent remains conscious during the course of several assaults." *Boggs* v. *Commonwealth,* 229 Va. 501, 521, 331 S.E.2d 407, 421 (1985), *cert. denied,* 475 U.S. 1031 (1986).

Here, although Arder would have died "shortly" from the gunshot wound to his head, his death was not instantaneous, and the jury could have found that he was still alive but unconscious when his hands were severed. Accordingly, the evidence was sufficient to support the jury's finding of vileness based upon aggravated battery.

## VIII. *Prosecutorial Misconduct*

Stockton contends that his due process rights were violated when, in the presence of the jury, the prosecutor referred to disparaging remarks Stockton had directed to the trial judge out of the hearing of the jury. Stockton argues that the prejudice caused by the prosecutor's misconduct requires a new sentencing trial.

During presentation of his case, Stockton called William Dent, chaplain of the Powhatan Correctional Center, as a character witness. Dent testified that he had met with Stockton on a number of occasions while Stockton was an inmate at the Correctional Center. The chaplain testified that Stockton had been friendly and respectful to him but that Stockton had said he had not "always been respectful to other people." In response to a question on cross-examination, Dent said that Stockton could say "some pretty nasty things to people." The prosecutor then asked Dent: "You're not aware of some comments directed to the judge in this case, are you?"[9]

When defense counsel objected, the trial court sustained the objection, and the prosecutor said he would withdraw the question. Stockton then moved for a mistrial. The court denied the motion, stating that the jury had no "knowledge of what the statement was and they're not supposed to guess, surmise or do anything of that nature, and the Court . . . does not feel that that

---

[9] We assume the prosecutor was referring to the occasion during jury selection when Stockton called the trial judge a "crook" and a "vile son-of-a-bitch."

comment tainted the jury in any way." We agree with the trial judge and reject Stockton's contention.

Stockton also complains about a comment the prosecutor made during defense counsel's closing argument to the jury. In discussing the allegation that Stockton had killed Ronnie Tate, defense counsel argued that Stockton's culpability for that murder had not been adjudicated or resolved. The prosecutor interrupted and said that Stockton's involvement in Tate's death was relied upon by the appellate courts as evidence of aggravating circumstances. Stockton moved for a mistrial. The trial court denied the motion.

Stockton argues that the prosecutor's comments "suggested to the jury that the appellate court had found Stockton guilty of killing Ronnie Tate" and also "informed the resentencing jury that the previous jury had sentenced Stockton to death." We disagree. We do not think the jury could possibly have put this strained interpretation on the prosecutor's remarks.

## IX. *Verdict Form*

Stockton contends that the verdict form prescribed by Code § 19.2-264.4(D) and used by the trial court "discouraged the jury from giving effect to . . . mitigating evidence once it found an aggravating factor." Stockton acknowledges that in *Watkins, supra,* we held that the form adequately emphasizes mitigating factors. 229 Va. at 490-91, 331 S.E.2d at 438. Stockton "respectfully requests," however, that we reconsider our decision. We decline the request. *See Hoke* v. *Commonwealth,* 237 Va. 303, 315, 377 S.E.2d 595, 602, *cert. denied,* 491 U.S. 910 (1989); *Clark* v. *Commonwealth,* 220 Va. 201, 213, 257 S.E.2d 784, 791-92 (1979), *cert. denied,* 444 U.S. 1049 (1980).

## X. *Validity of Death Sentence*

Stockton also requests that we reconsider our decisions, such as *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979), in which we upheld the constitutionality of Virginia's death penalty statutes, and decisions, such as *Martin* v. *Commonwealth,* 221 Va. 436, 271 S.E.2d 123 (1980), in which we held that death by electrocution does not constitute cruel and unusual punishment. We deny both requests.

Further, Stockton contends that he "cannot obtain meaningful appellate review of his death sentence because of this Court's fail-

ure to apply a standard method to determine 'whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' Va. Code Ann. § 17-110.1(c)(2)." We reject this contention.

Finally, citing *Proffitt* v. *Florida*, 428 U.S. 242 (1976), Stockton argues that he "is denied meaningful appellate review because the Virginia statutory death sentencing scheme . . . does not require the trial judge or jury to specify the findings that justified imposition of a death sentence." *Proffitt* involved Florida's death penalty statutes. Under those statutes, a jury's death verdict is advisory only; the trial judge determines the actual sentence. *Id.* at 248-49. The trial judge is required to weigh the statutory aggravating and mitigating circumstances and, if the trial court imposes a sentence of death, it must " 'set forth in writing its findings upon which the sentence of death is based as to the facts: (a) [t]hat sufficient [statutory] aggravating circumstances exist . . . and (b) [t]hat there are insufficient [statutory] mitigating circumstances . . . to outweigh the aggravating circumstances.' " *Id.* at 250 (citation omitted).

██ Under Virginia's statutes, the jury *fixes* the sentence. Code § 19.2-264.3. As noted previously, a sentence of death may not be imposed unless the jury finds the existence of one or both of the aggravating circumstances of future dangerousness and vileness. Code § 19.2-264.2. A Virginia jury's verdict must be in writing, and it must set forth the statutory aggravating circumstances upon which it is based. Code § 19.2-264.4(D). The trial judge may "set aside the sentence of death and impose a sentence of imprisonment for life" only "upon good cause shown." Code § 19.2-264.5. Hence, *Proffitt* is inapposite, and we reject Stockton's contention.

## XI. *Passion and Prejudice*

Under Code § 17-110.1(C)(1), this Court must determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Stockton argues that his "death sentence was imposed under the influence of prejudice." He says "the jury's ability to fairly sentence [him] was undermined by . . . being shackled in front of the jury . . . and [by] highly prejudicial prosecutorial misconduct."

■ We have demonstrated in Part I of this opinion that there was no reversible error in the shackling of Stockton and in Part VIII that there was no reversible error in the conduct of the prosecutor. Neither instance, therefore, can support Stockton's claim of prejudice.

■ Stockton also argues that his death sentence "was infected by impermissible passion and prejudice" resulting from photographs of Arnder's decomposed body that were admitted into evidence. As we have said on many occasions, including *Stockton I*, 227 Va. at 144, 314 S.E.2d at 384, the admission of photographs is a matter resting within the sound discretion of the trial court, and we will not disturb its action unless a clear abuse of discretion is shown. We find no abuse of discretion here.

■ Stockton also attempts to rely upon issues raised in assignments of error he has not briefed. He seeks to place the blame on this Court for refusing to grant him leave to file a brief in excess of the 50-page limitation set by Rule 5:26. However, we will adhere to the rule that we will not consider any assignment of error that is not briefed. Rule 5:27(e); *Cheng* v. *Commonwealth*, 240 Va. 26, 41, 393 S.E.2d 599, 607 (1990).

## XII. *Excessiveness and Disproportionality*

Code § 17-110.1(C)(2) requires that we consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In *Boggs, supra*, we said that "[b]ecause we are directed by Code § 17-110.1(C)(2) to compare 'similar' cases, we give special attention to those in which the underlying felony, the penalty predicate, and the facts and circumstances surrounding the commission of the crime are fairly comparable." 229 Va. at 522, 331 S.E.2d at 422.

■ In an earlier murder-for-hire case, *Clark, supra*, we affirmed the conviction and death sentence of a defendant who, with a cousin, murdered the victim in return for $7,000. In *Stockton I*, adverting to *Clark*, we said: "Stockton also has not shown any reason why his punishment is excessive or disproportionate. The single gunshot wound between Arnder's eyes is indicative of a deliberate, execution-type murder which Stockton performed for a purely pecuniary motive. In addition, the mutilation of the victim's body was shocking." *Stockton I*, 227 Va. at 152-53, 314 S.E.2d at 389.

We also made in *Stockton I* a comparison with other cases in which the sentences of death were imposed upon findings of both dangerousness and vileness. *Id.* at 152, 314 S.E.2d at 389. We said that, from our review, "we determine that the sentence of death imposed upon Stockton was not excessive or disproportionate to sentences generally imposed by other sentencing bodies in this jurisdiction for crimes of a similar nature." *Id.*

■ In the meantime, we have decided several other capital cases where the death penalty was based upon findings of both dangerousness and vileness. *E.g., Spencer* v. *Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied*, 498 U.S. ____, 111 S.Ct. 281 (1990) (*Spencer IV*); *Edmonds* v. *Commonwealth*, 229 Va. 303, 329 S.E.2d 807, *cert. denied*, 474 U.S. 975 (1985). A review of pre- and post-*Stockton I* decisions, as well as capital cases resulting in life imprisonment, convinces us that "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

Stockton submits, however, that his actions do not approach the "heinous behavior" exhibited in some of our decisions. "But no concept of proportionality requires that each new capital murder case equal in horror the worst possible scenario yet encountered, else the death penalty may not be imposed." *Turner* v. *Commonwealth*, 234 Va. 543, 556, 364 S.E.2d 483, 490, *cert. denied*, 486 U.S. 1017 (1988). Besides, by its very name, a murder-for-hire case imports its own special heinousness.

## XIII. *Conclusion*

Finding no error in the record or any other reason to disturb Stockton's death sentence, we will affirm the judgment of the trial court.

*Affirmed.*