Present:  All the Justices

MARLON DWAYNE WILLIAMS
                                          OPINION BY
v.  Record No. 960069          CHIEF JUSTICE HARRY L. CARRICO
                                          June 7, 1996
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                    Russell I. Townsend, Jr., Judge


     In this appeal, we review the death sentence imposed upon
Marlon Dwayne Williams following his conviction of capital murder.
In February 1995, a grand jury returned an indictment charging
that Williams, on November 9, 1993, "did, for hire, willfully,
deliberately and with premeditation kill and murder Helen
Bedsole."  Code § 18.2-31(2).  On July 25, 1995, Williams pled
guilty to capital murder as charged in the indictment.  After
considering the report of a probation officer and conducting a
sentencing hearing, the trial court fixed Williams' punishment for
capital murder at death, based upon a finding of future
dangerousness.  Code § 19.2-264.2.[1]

     Under Code § 17-110.1(C), we are required to "consider and
determine . . . [w]hether the sentence of death was imposed under
the influence of passion, prejudice or any other arbitrary
factor," Code § 17-110.1(C)(1), and "[w]hether the sentence of

---

[1]In relevant part, Code § 19.2-264.2 provides that:

     In assessing the penalty of any person convicted of an
     offense for which the death penalty may be imposed, a
     sentence of death shall not be imposed unless the court
     or jury shall . . . after consideration of the past
     criminal record of convictions of the defendant, find
     that there is a probability that the defendant would
     commit criminal acts of violence that would constitute
     a continuing serious threat to society.

death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," Code § 17-110.1(C)(2). This required review is in addition to "consideration of any errors in the trial enumerated by appeal." Code § 17-110.1(C).

Originally, Williams made two assignments of error, both related to punishment, (1) that the death sentence was the product of passion, prejudice, or other arbitrary factor, and (2) that the sentence was excessive and disproportionate. He did not assign error to any other aspect of the case, and, on brief, he specifically waived the issue raised by his assignment related to passion, prejudice, or other arbitrary factor.

However, notwithstanding the waiver, we have examined the record and find nothing to indicate that Williams' death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor." Code § 17-110.1(C)(1). This leaves only the question whether Williams' sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2).

The parties stipulated that if the case had gone to trial, the Commonwealth would have presented evidence proving the following facts regarding the murder. For several months prior to November 1993, Williams was involved in selling cocaine to Clark Bedsole. At some point, Bedsole asked Williams and others about hiring someone to kill Bedsole's wife. On November 9, 1993, Williams left work early and returned to his apartment where he

lived with two other men, Larry Baker and Ed Young.  Williams borrowed a bicycle and clothing from Young.  He also "borrowed" a Colt .380 pistol from Baker without Baker's knowledge.

Williams rode the bicycle to Mrs. Bedsole's home around 5:00 p.m.  He broke through the storm door, went into the kitchen where Mrs. Bedsole was standing, and shot her twice in the head with the gun he had borrowed from Baker.  After he shot Mrs. Bedsole, Williams left her house and deposited the bicycle in a nearby wooded area.  He then proceeded on foot to Mr. Bedsole's place of employment, where they spoke briefly.  Mr. Bedsole gave Williams a ride back to the latter's apartment.  Over a year later, on November 10, 1994, Williams admitted to Baker in a taped conversation that he had killed Mrs. Bedsole at her husband's request in exchange for $4,000.

In addition to the foregoing stipulation, several witnesses testified at the sentencing hearing.  The Commonwealth called Williams' friend, Larry Baker, who testified that during the taped conversation in November 1994, Williams told him that "if [the gun] hadn't jammed he would have emptied the clip in [Mrs. Bedsole's] head" and shot her six more times.

Tanesha Alston testified that she met Williams in January 1992, that the two began dating, and that she moved in with him.  According to Alston, Williams treated her very well at first, but after about a year he began assaulting her physically and, in June 1994, she moved out.

In September 1994, Alston was driving her car when she passed Williams and Baker on the road.  Williams motioned Alston to pull

over, and she did. Williams then got out of Baker's car, exchanged words with Alston, and began hitting and kicking her. Alston was knocked unconscious and woke up at the hospital, where Williams and Baker had taken her. While helping Alston to the emergency room, Williams told her "[she] better not say anything or he would kill [her]." He instructed her to "tell the people at the hospital . . . there was some girls that jumped [her] and he had found [her]." Alston followed Williams' instruction.

Baker testified that shortly after the September 1994 incident, Williams told him that because Alston "had [Williams'] money," he planned to kill Alston's brothers, mother, and father on Halloween and cause Alston to commit suicide. For about a week, Williams and Baker "cased out" her family's house and planned the murders. Williams subsequently discovered that Alston was staying with her seventy-one year old grandmother, Virginia Parker, and told Baker "he was going to Tanesha's grandmother's house to finish what he started."

Parker testified that on October 3, 1994, she was awakened around 11:00 p.m. by the sound of someone breaking through her front door. A man wearing a mask entered her bedroom, hit her with his fist, tried to smother her with a pillow, and cut her throat. Parker was able to fight off her attacker, and he left. Before leaving, however, the attacker "snatched [Parker's] phone out so [she] couldn't call for help." Still bleeding from her cut throat, she walked to a neighbor's house for help.

On March 30, 1995, Williams pled guilty to the assault and battery of Alston. In August 1995, Williams pled guilty to

burglary, malicious wounding, and cutting or wounding in the commission of malicious wounding, all three charges stemming from the incident involving Alston's grandmother.

While an inmate at the Chesapeake City Jail, Williams assaulted a fellow inmate who taunted Williams, telling him he was "going to fry."  On July 18, 1995, Williams pled guilty to a charge of assault and battery growing out of the jail incident.

As a juvenile, Williams was found guilty of burglary in Las Vegas, Nevada, following the theft of a camera and television set from the home of his maternal aunt, Jean Brooks, who had befriended him.  Also as a juvenile, Williams was found guilty of petit larceny, breaking and entering, unlawful wounding, and assault and battery in Petersburg, Virginia.  The unlawful wounding and assault and battery charges arose out of an incident involving two other youths.

Concerning the Petersburg convictions, Williams told Kim Johnston, the probation and parole officer who prepared the sentencing report in the present case, that the youths were harassing his sister and that he was defending her.  However, Johnston testified that, according to Williams' juvenile record, he attacked the youths in front of a police officer after they "told on him" for misconduct.  According to Johnston, Williams' record reflected that he told the youths "he was going to kill them."

Johnston testified that when she met with Williams while preparing the sentencing report, she asked him if he ever thought about Mrs. Bedsole and what he had done.  Williams' only response

was, "I think about how I could have gotten away with it." She also asked Williams if he felt sorry about assaulting Alston. Williams indicated that although he told Alston he was sorry, he was not really sorry. Williams also told Johnston he was pleading guilty to the charge of murder because he was guilty and did not want to blame anyone else for what he had done.

With his friend Baker, Williams engaged for a period of approximately four years in the distribution of cocaine, Baker on a regular basis and Williams on a part-time basis. However, Baker became "a paid informant to the police department relative to the Bedsole case," and he agreed with the police "to have his car wired so a tape recording of [a] conversation inside the car [with Williams] could be made."

In this conversation, which took place on November 10, 1994, Baker led Williams into planning "how [they were] going to do" what Baker, but not Williams, knew was a fictitious murder. Mentioning "Murder, Incorporated," Baker told Williams: "You gotta, you know you have to . . . steer me to the art of this, right?" Williams participated actively in planning the murder with Baker, even specifying the caliber of weapon that should be used to "shatter [the victim] to pieces."

In mitigation, Williams presented evidence regarding his troubled childhood. His aunt, Jean Brooks, testified that when Williams' mother decided to enter the army, Brooks agreed to take care of Williams, who came to live with her in Las Vegas, Nevada. Brooks described Williams, who was one and one-half to two years old at the time, as "bright, happy, [and] loving." Williams

became very attached to his aunt and uncle; however, when Williams was five years old, his mother left the army and reclaimed custody of him.

Several years later, when Williams was about ten years old, Brooks saw him at a family reunion and testified that Williams appeared "a little more withdrawn." Brooks spoke with Williams' stepfather who told her he sometimes whipped Williams harder than he whipped his own child because Williams was not his real son. In 1983, Williams' mother severely beat him with a television stand. During counseling sessions following the incident, Williams' mother and stepfather professed their firm belief in corporal punishment. On April 29, 1986, the Department of Social Services removed Williams from his mother's home after she severely beat him with a broom stick.

Williams was placed in a foster home; however, he was removed from the home after he became uncontrollable and threatened to burn the house down. Subsequently, Williams was sent back to Las Vegas to live with his aunt. After the incident involving the theft from Brooks, Williams was sent to Petersburg to live with his mother. Following his subsequent arrest in Petersburg, Williams was again placed in the custody of the Department of Social Services and then the Department of Youth and Family Services until he reached the age of eighteen. Brooks testified that despite Williams' past, she still thought he was "an inherently good person."

A report prepared by a psychologist after a 1989 examination of Williams states as follows:

Considerable feelings of hopelessness and a pessimistic outlook are noted in the test results, and Dewayne seems to expect unhappiness, loss, and failure in his life. While it appears that Dewayne has had a fairly positive relationship with his aunt who lives in Nevada, this relationship has been interrupted several times, and the unstable nature of this relationship along with the abuse he has suffered at the hands of his parents have no doubt contributed to Dewayne's very depressed and pessimistic outlook. While he denied any past or current suicidal thoughts, the test results suggest the potential for suicidal ideation exists, and self-destructive or injurious behavior should be guarded against. Dewayne appears to be an individual who denies and represses his uncomfortable feelings, which results in considerable inner tension and irritability. Eventually the levels of repressed anger and unhappiness become too great, and Dewayne acts out impulsively and even explosively.

As noted previously, Code § 17-110.1(C)(2) directs this Court to consider "similar" cases in determining whether a death sentence is excessive or disproportionate. In this consideration, "'we give special attention to those [cases] in which the underlying felony, the penalty predicate, and the facts and circumstances surrounding the commission of the crime are fairly comparable.'" Stockton v. Commonwealth, 241 Va. 192, 217, 402 S.E.2d 196, 211, cert. denied, 502 U.S. 902 (1991) (quoting Boggs v. Commonwealth, 229 Va. 501, 522, 331 S.E.2d 407, 422 (1985), cert. denied, 475 U.S. 1031 (1986)). And the test of excessiveness and disproportionality is "'whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant.'" Roach v. Commonwealth, 251 Va. 324, 350, 468 S.E.2d 98, 113 (1996) (quoting Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993)).

Williams contends that his appeal involves "a simple murder for hire case unaggravated by the nature and circumstances" of the other murder for hire cases in which the death penalty has been imposed.  There are four such cases, <u>Clark v. Commonwealth</u>, 220 Va. 201, 257 S.E.2d 784 (1979), <u>cert.</u> <u>denied</u>, 444 U.S. 1049 (1980), <u>Fisher v. Commonwealth</u>, 236 Va. 403, 374 S.E.2d 46 (1988), <u>cert.</u> <u>denied</u>, 490 U.S. 1028 (1989), <u>Stockton v. Commonwealth</u>, 241 Va. 192, 402 S.E.2d 196, <u>cert.</u> <u>denied</u>, 502 U.S. 902 (1991), and <u>Murphy v. Commonwealth</u>, 246 Va. 136, 431 S.E.2d 48, <u>cert.</u> <u>denied</u>, 510 U.S. ___, 114 S.Ct. 336 (1993).[2]

Williams also contends that the "nature and circumstances of the murder for hire in his case are more akin" to those murder for hire prosecutions in which life sentences were imposed.  Williams cites eight such cases, but our research discloses that there are actually eleven, <u>Stewart v. Commonwealth</u>, Record No. 790336 (pet. for appeal refused 5/31/79), <u>Martin v. Commonwealth</u>, Record No. 800832 (pet. for appeal refused 12/10/80), <u>Crawford v. Commonwealth</u>, Record No. 840620 (pet. for appeal refused 3/6/85), <u>Biggs v. Commonwealth</u>, Record No. 850070 (pet. for appeal refused 7/29/85), <u>Whitworth v. Commonwealth</u>, Record No. 880504 (pet. for appeal refused 11/29/88), <u>Anderson v. Commonwealth</u>, Record No. 890634 (pet. for appeal refused 1/5/90), <u>Robinson v. Commonwealth</u>,

_____

[2]Contrary to Williams' contention, our examination of these cases reveals that <u>Stockton</u> is the only one where the brutality of the crime and the record of the accused for violent behavior may have equalled or surpassed the same elements in the present case.  Otherwise, only the amount of money involved as compensation for committing murder distinguishes Williams' situation from the four murder for hire cases where the death penalty was imposed.

Record No. 910662 (pet. for appeal refused 8/12/91), Callahan v. Commonwealth, Record No. 911000 (pet. for appeal refused 10/4/91), Tucker v. Commonwealth, Record No. 911223 (pet. for appeal refused 11/5/91), Barksdale v. Commonwealth, Record No. 911723 (pet. for appeal refused 1/15/92), and Radcliff v. Commonwealth, Record No. 951578 (pet. for appeal refused 1/10/96).

We have reviewed all our previous murder for hire decisions involving both life imprisonment and sentences of death. We have also reviewed other capital murder cases where the underlying felonies were different but where, as here, the sentence of death was based upon a finding of future dangerousness.

Based upon our review and a consideration of both Williams and the crime he committed, we are satisfied that, "while there are exceptions,"[3] Roach, 251 Va. at 351, 468 S.E.2d at 114, other sentencing bodies in this Commonwealth generally impose the supreme penalty for comparable or similar offenses. Accordingly, we conclude that Williams' sentence of death is neither excessive nor disproportionate. With respect to Williams' mitigation evidence concerning his psychological background, including the physical abuse he suffered as a child, the trial judge stated he had "taken all of that into consideration" yet could not "see in any way how [he could] find . . . extreme mental or emotional disturbance at the time [Williams] killed the victim in this

---

[3] Tucker v. Commonwealth, Record No. 911223 (pet. for appeal refused 11/5/91), cited in the text, is one of those exceptions. Like Williams, Tucker was the triggerman in his murder for hire, and, like Williams, he had a substantial record of violent behavior. Yet, the jury fixed Tucker's punishment at life imprisonment.

case." We think the record fully supports the judge's statement and leads to the conclusion that the evidence of Williams' psychological background was insufficient to mitigate his offense or to justify the commutation of his sentence.

Because Williams' sentence of death is neither excessive nor disproportionate and no reason exists to commute the sentence, we will affirm the judgment of the trial court.

<u>Affirmed</u>.