Present: Hassell, C.J., Lacy, Koontz, Kinser, and Lemons, JJ., and Carrico* and Stephenson, S.JJ.

JUSTIN MICHAEL WOLFE

v.  Record No. 021872

COMMONWEALTH OF VIRGINIA
                    OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
                              February 28, 2003
JUSTIN MICHAEL WOLFE

v.  Record No. 022194

COMMONWEALTH OF VIRGINIA

        FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                Herman A. Whisenant, Jr., Judge

    In these appeals, we review the capital murder

conviction, sentence of death, and related convictions imposed

upon Justin Michael Wolfe.

                              I.

    The defendant was tried before a jury on indictments for

the following offenses:  the capital murder of Daniel Robert

Petrole, Jr., in violation of Code § 18.2-31(2), the willful,

deliberate, and premeditated killing of any person by another

for hire; use of a firearm in the commission of a felony in

violation of Code § 18.2-53.1; and conspiracy to distribute

marijuana in violation of Code §§ 18.2-248.1 and -256.  The

jury found the defendant guilty of these crimes and fixed his

---

    * Chief Justice Carrico presided and participated in the hearing and decision of this case prior to the effective date of his retirement on January 31, 2003.

punishment at 30 years imprisonment for the drug charges and three years imprisonment for the use of a firearm.

In the penalty phase of the capital murder trial, the jury fixed the defendant's punishment at death, finding that he represented a continuing serious threat to society and that his offense was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim. After considering a report prepared by a probation officer pursuant to Code § 19.2-299, the circuit court sentenced the defendant in accordance with the jury verdicts.

We consolidated the automatic review of the defendant's death sentence with the appeal of his capital murder conviction, and the defendant's appeal of his non-capital convictions was certified from the Court of Appeals. We have consolidated the defendant's appeal of his non-capital convictions with his capital murder appeal, and we have given these appeals priority on our docket.

## II.

In accordance with well-established principles of appellate review, we will review the evidence in the light most favorable to the Commonwealth, the prevailing party below. Zirkle v. Commonwealth, 262 Va. 320, 323, 551 S.E.2d 601, 602 (2001).

The defendant was a major drug dealer in Northern Virginia. He regularly sold high-grade marijuana, referred to as "kind bud" or "chronic," for a price between $4,200 and $5,000 per pound. His marijuana supplier was Daniel Robert Petrole, Jr., who began to supply marijuana to defendant in November 2000, seven months before he was murdered.

Petrole, a major drug supplier of high-grade marijuana in Northern Virginia, regularly purchased about 100 pounds of marijuana per month at a price of $360,000. Petrole usually sold the defendant between eight and 18 pounds of marijuana every two weeks. The defendant described Petrole as his "chronic man."

In furtherance of their drug activities, the defendant and Petrole utilized an informal system of credit described as "fronting." When Petrole sold the defendant marijuana, the defendant gave Petrole a quantity of cash as a down payment, and the defendant paid the balance when he received proceeds from the sales of marijuana to others. Petrole maintained a record of sales of marijuana to dealers such as the defendant, and payments made by those dealers, on documents commonly known as "owe sheets." The "owe sheets" contained the amounts of the debts that drug dealers owed to Petrole. On occasions, the defendant owed Petrole as much as $100,000. An "owe sheet" that was discovered on Petrole's body the night he was

3

murdered indicated that the defendant owed Petrole more than $60,000.

The defendant and his friends, T. Jason Coleman and Chad E. Hough, had discussions about robbing drug dealers. On one occasion, the defendant, Hough and Coleman planned to rob a drug dealer at a location in Washington, D.C., but after they conducted surveillance of the planned location of the robbery, they concluded that the extensive level of security at the location rendered their plan too risky.

Janelle E. Johnson, Coleman's wife, testified that in the winter of 2000, the defendant and Coleman discussed committing a burglary or stealing money from another drug dealer who sold marijuana in Northern Virginia. In furtherance of this plan, the defendant and Coleman purchased ski masks and duct tape.

Hough testified that he and the defendant "talked about performing robberies most of the time. Almost every time we got together, it was usually some type of robbery connected with drugs." In January or February 2001, the defendant asked Hough if he "wanted to maybe be in on making some money, and [the defendant] mentioned . . . that [Hough] could . . . make some money by taking [part] in a robbery . . . ." The defendant wanted Hough to rob a drug dealer when the defendant was "making a buy." The defendant wanted Hough to follow the drug dealer and rob him. The defendant did not mention the

4

drug dealer's name, but Hough concluded that the defendant wanted Hough to rob the defendant's drug supplier.

Owen M. Barber, IV, and the defendant had been "good friends" for six or seven years. Barber, who was also a drug dealer, purchased low-quality marijuana, referred to as "shwag." Occasionally, he sold pounds of marijuana to the defendant. The defendant asked Barber if he "wanted to get [the defendant's] chronic man." The defendant stated that Barber must not merely rob his "chronic man," but that Barber must shoot him because Petrole knew too many people. Barber testified as follows:

> "Q: [D]id there come a point in time when you had a discussion concerning [the defendant's] supplier of chronic or kind bud [marijuana]?
>
> "A: Yeah. It was one day when we were at [a restaurant] just drinking and [the defendant] asked me if I wanted to get his chronic man.
>
> "Q: Get the chronic man?
>
> "A: Yeah. And I was like, yeah, you know, we'll just rob him or whatever. And I was like, all right, you know and then he said, no, no you can't rob him. He was like, we got to shoot him because he knows too many people.
>
> "Q: He knows too many people?
>
> "A: Yeah.
>
> "Q: At that point in time, did he tell you who his chronic man was?
>
> "A: Yeah.

5

"Q: Who was it?

"A: He said Danny Petrole.

"Q: Had you known Danny Petrole prior to that time?

"A: No. I knew the name. I didn't know him like personally."

This conversation occurred in late February or early March, 2001.

The "next couple of days" after the defendant and Barber had the conversation about robbing and killing Petrole, the defendant and Barber planned how they "could do it and how [they would] have to find him or . . . follow him or catch him alone." On one occasion, the defendant and Barber went to Petrole's apartment in Washington, D.C. to determine if it was feasible to kill him at that location. The owner of the apartment building employed a doorman, and the defendant and Barber concluded that they should not kill Petrole at that location.

Subsequently, the defendant and Barber made another attempt to locate and kill Petrole. The defendant made a telephone call to Petrole one night, and Petrole informed the defendant that Petrole intended to attend a class at the Northern Virginia Community College campus in Arlington or Annandale, Virginia. Barber was not sure of the specific campus where Petrole attended community college. The

defendant and Barber got in Barber's car and traveled to the campus. They "drove around the parking lot" looking for Petrole's car, but they were unable to find it.

On another occasion, the defendant spoke with Petrole, who informed the defendant that he (Petrole) planned to eat dinner at a restaurant in Washington, D.C. The defendant and Barber traveled to the restaurant in search of Petrole. Barber testified that they "went and looked for him at the restaurant . . . and we didn't see him. Then we went back and we waited in the parking lot . . . behind his building." Barber and the defendant did not find Petrole that evening. Barber and the defendant concluded that they were going to kill Petrole if he returned to his apartment that night. If he did not return to his apartment, they were going to wait until they had another opportunity to kill him.

During the next several days, Barber and the defendant continued to discuss their plan to kill Petrole. On March 15, 2001, the defendant placed a telephone call to Barber, who was with a friend, Robert H. Martin, Jr. The defendant directed Barber to meet the defendant at a restaurant in Fairfax County. Barber and Martin went to the restaurant, and Barber and the defendant spoke alone in a parking lot. The defendant informed Barber that the defendant had spoken to Petrole, and the defendant planned to meet him that night. Petrole had

7

agreed to bring a large quantity of high-grade marijuana to an apartment that the defendant shared with his girlfriend, Regina A. Zuener.

The defendant and Barber agreed that Barber would follow Petrole once he left Zuener's apartment. Barber returned to the car where Martin had waited, and they went to Barber's apartment. About an hour later, the defendant, using his cellular telephone, called Barber to inform him that Petrole was "on his way" to Zuener's apartment. Barber called the defendant and inquired whether Petrole had arrived, and the defendant informed Barber that Petrole had not.

Barber asked Martin if he wanted to accompany Barber "on this thing [Barber] had to do," but Martin refused. Barber testified as follows: "I think I told [Martin], you know, I've got to go do this thing and he was like – he said he was [willing] to beat him up or to rob him or whatever. And I was like, no, you know, it's more than that. He's like, no, no, I'm not going to do it. I'll let you have my car, but I'm not going to do it." Barber wanted to use Martin's car to travel to Zuener's house so that he could rob and kill Petrole because Barber's car was too distinctive. Barber's car was equipped with racing tires and a large noisy engine.

Barber, armed with a Smith & Wesson nine millimeter pistol that he had purchased from Coleman, got into Martin's

8

car and drove to a cul-de-sac at the end of a street near Zuener's apartment. Petrole arrived at Zuener's apartment in Centreville. The defendant, Jennifer E. Pascquierllo, Nicholas Soto, and Coleman were present. Petrole knocked on the door, and Zuener let him in. Petrole was carrying a large black duffel bag filled with high-grade marijuana. Petrole and the defendant went upstairs to a bedroom. Later, Zuener went to the bedroom where she observed a large drug transaction occur between Petrole and the defendant. She saw between 10 and 15 pounds of high-grade marijuana on her bed. Petrole had a large amount of money. The marijuana was packaged in separate bags, weighing approximately one pound each. When the drug transaction was completed, the defendant and his friends went to a nightclub, and Petrole left the apartment and got in his car.

As Petrole began to drive his car, unbeknownst to him, Barber followed Petrole as he drove through Fairfax County. Petrole parked his car in front of a house in Fairfax County and went inside. Barber, using his cellular telephone, called the defendant and informed him that Petrole "went into some house in Fairfax City." Later, Petrole got back in his car and drove off as Barber continued to follow him. While following him, Barber temporarily lost sight of Petrole's car, but managed to locate it and continued to follow him. Petrole

drove his car to a neighborhood where he had recently purchased a townhouse and parked his car. Barber stopped the car he was driving and "jumped out." Barber stated, "I shot him across through the passenger side window and the[n] jumped back in the car and turned around and then left out with . . . my lights off." Barber shot Petrole 10 times, and he was five or six feet from the victim when he discharged the pistol. Barber damaged Martin's car during the murder. As Barber sped away, he tossed the pistol and gloves he used out of the car window.

Issa Hassan, Walter P. Gunning, Jr., and Jeanette Lorentzen were in Petrole's townhouse when they heard noises and ran to the window. They observed a red Ford Escort as it "sped off real fast and turned its lights as it turned around the corner." Issa Hassan went outside, and he saw Petrole seated in the driver's seat of the car. Hassan opened the door and shook Petrole. Petrole's neck was "flimsy," and he did not have a pulse. The car's windows were shattered, and there was "glass everywhere in the car."

Police officers responded to the scene of the murder and found $965 on the victim's body. The police officers found $17,460 in United States currency in the victim's duffel bag located in the trunk of his vehicle. The police officers searched the victim's house and found approximately $120,000

10

cash, 46 pounds of high-grade marijuana, which was "vacuum packed" in plastic bags, 4,000 tablets of metholanedioxine, an amphetamine, also known as Ecstasy, and an "owe sheet."

Gunning, Petrole's roommate, testified that Petrole was angry with the defendant because he owed Petrole over $66,000 and that the defendant had taken "a little longer than what he expected to pay him back."

Dr. Frances P. Field, an assistant medical examiner, conducted an autopsy upon Petrole's body. She gave the following testimony. The victim had nine gunshot wounds in his body. One bullet penetrated the victim's spinal column and severed the spinal cord. Bullets damaged the victim's ribs, abdomen, liver, kidney, large intestines, small intestines, aorta, lung, and chest. Dr. Field opined that the defendant's death was caused by multiple gunshot wounds, and that any of the wounds which injured the internal organs such as the lung, liver, kidney, or spinal canal could have proven fatal because of bleeding from those sites.

After he had committed the murder, Barber returned to his apartment and told Martin that he had killed Petrole. Barber used his cellular telephone to talk with the defendant, who was at the nightclub.

Barber changed clothes, and he and Martin went to the nightclub to meet the defendant. Once Barber and Martin

11

entered the nightclub, Barber and the defendant spoke outside of Martin's presence. Barber told the defendant that he (Barber) "did it and it was done." The defendant responded, "all right." Then the defendant gave Barber "like a pound and a half hug." The defendant "ordered a round of drinks" for himself, Barber, and Martin. The defendant commented that "we got to have a made cake now – or like a rack of cake," a slang expression that means "we made a lot of money." The purpose of the toast was to celebrate their "rack of money."

In return for his act of killing Petrole, the defendant told Barber that he did not have to pay for four pounds of marijuana that the defendant had previously sold him. Additionally, the defendant gave Barber a half pound of "chronic" marijuana, forgave Barber's $3,000 debt for past drug transactions, and promised to pay Barber $10,000 in cash.

Martin testified at trial, and his testimony corroborated Barber's version of the events on the night of the murder. Martin and Barber had dinner with Martin's parents on the evening of March 15 before the murder. After dinner, Barber and Martin went to Barber's apartment that he shared with Coleman. They drank beer and smoked marijuana. Martin observed Barber when he had the conversation with the defendant in the parking lot of the restaurant. After the conversation, when the men were at Barber's apartment, Barber

told Martin that Barber intended to "put one in each kneecap." Barber told Martin that Barber intended to leave the apartment with his pistol after he received a telephone call from the defendant. After Barber received the telephone call, he left the apartment, followed Petrole, and killed him.

Martin testified that after the murder, he and Barber went to the nightclub and when they met the defendant, Barber told Martin "to go away" so that the defendant and Barber could have a private conversation. After the defendant and Barber had concluded their private conversation, Martin approached them. The defendant and Barber gave Martin an alcoholic beverage, and the defendant "told [Martin] right there you can't say nothing about this and I'm about to make a lot of money." Immediately, the defendant, Barber, and Martin made a toast.

After the murder, Martin approached the defendant and asked for a discount for the purchase of marijuana. Martin told the defendant, "I know what happened." The defendant gave Martin a discount on the purchase and forgave him of a past drug debt.

The day after the murder, the defendant and several friends, including Barber, went shopping to purchase clothes to wear to a birthday party in honor of the defendant on March 17, 2001. The defendant and his friends purchased several

13

bottles of expensive champagne for his birthday party that cost in excess of $200 per bottle.

After his birthday party, the defendant decided that things were getting "too hot" with the police, and he fled to Florida. Police officers searched Barber's apartment and interrogated him, but he denied any involvement in Petrole's murder. Barber left Virginia, went to Florida, and then fled to San Diego, California. Barber contacted his former girlfriend, Jennifer Pascquierllo, and asked her to obtain money from the defendant and bring the money to Barber. The defendant gave her $1,000. She drove her car to meet Barber in San Diego, where he was eventually arrested by United States Marshals.

Three days after the murder, Barber gave Martin $540 and directed him to repair the damage to his car and to replace the tires. Barber was afraid that the car's tires may have created identifiable skid marks at the scene of the murder. Barber instructed Martin to take the car to Virginia Beach, Virginia, and get it repaired there. Martin told Barber that Martin was not "going to help him out." Martin tried to return the money, but Barber would not accept it. That night, Martin contacted police officers and reported the crime.

Pascquierllo testified that Barber relayed to her the facts relating to the murder of Petrole. Her testimony

concerning these facts was consistent with Barber's trial testimony. She also testified: "I asked [Barber] what the sum of money was, what kind of sum of money it could have been, and he told me that it was $10,000 and he got some weed, but that he had to flush it, and then he told me that it was also the $3,000 debt that involved me." Pascquierllo testified that Barber tried unsuccessfully to obtain from the defendant the $10,000 that he had promised to pay Barber to kill Petrole.

The defendant made numerous admissions during his testimony. The defendant admitted that he had been a drug dealer for four or five years before Petrole's death. He admitted that he was guilty of the charge of conspiracy to distribute more than five pounds of marijuana. He had distributed more than 100 pounds of marijuana throughout Northern Virginia since he began selling drugs. He admitted that he had spoken to his friends about robbing a drug dealer. He admitted that he had discussed with Coleman the possibility of committing robberies. The defendant admitted that he was the last person Barber called before Barber killed Petrole and the first person Barber called after Petrole's death. He admitted that he sold marijuana to Martin after the murder and that Martin stated, "I know what happened." After Martin made

this statement, the defendant admitted he decreased the price of the marijuana he sold to Martin.

The defendant testified that one of his highest priorities was the "high life" that money could obtain for him. The defendant regularly spent between $2,000 and $3,000 on weekends for entertainment purposes. The defendant admitted that he owed Petrole more than $80,000 at the time of Petrole's death.

The defendant claimed that Barber testified untruthfully about him because the defendant purportedly had had sexual relations with Barber's former girlfriend, Pascquierllo. However, the defendant admits that when asked by the police detectives, "[d]id Owen have anything against you?," the defendant responded, "no." Additionally, Pascquierllo denied that she ever had a sexual relationship with the defendant.

### III.

During the penalty phase of the capital murder proceedings, the Commonwealth adduced the following evidence. Daniel Petrole, Sr., and Jane Alison Petrole, the victim's parents, discussed the impact of his death upon their family. The Commonwealth also presented the defendant's juvenile records which consisted of an order dated October 10, 1997, which was an adjudication of guilt for possession of less than five pounds of marijuana. Additionally, the defendant, as a

16

juvenile, had committed numerous probation violations by breaking into his mother's home, purchasing alcoholic beverages, possessing a false identification card, assuming a false name, and testing positive for amphetamines and cannabinoids. The defendant also had been convicted in Florida for possession of a false identification card.

The defendant presented extensive evidence about his background and character. Dr. William Ling, a clinical psychologist who qualified as an expert witness, presented testimony favorable to the defendant. Dr. Ling testified, however, that "the best predictor of future behavior is past behavior," and that "[s]ubstance abuse has been shown to have a high incidence or a high correlation with risk of future violence."

IV.

The defendant filed 37 separate assignments of error. However, the defendant failed to brief assignments of error 2, 3, 10, 11, 12, 13, 21, 23, 30, 31, and 32. Even though the defendant claimed in his reply brief that he discussed these assignments of error in his opening brief, the defendant's assertions are incorrect. In his reply brief to the Commonwealth's brief, the defendant purportedly identified pages in his initial brief where the assignments of error were discussed. We have reviewed the defendant's brief, and the

17

arguments are simply not present therein. Moreover, during the oral argument before this Court, the defendant could not demonstrate where in his brief these assignments of error were addressed. He merely referred this Court to his reply brief.

In accordance with our well-established precedent, Lenz v. Commonwealth, 261 Va. 451, 458, 544 S.E.2d 299, 303, cert. denied, 534 U.S. 1003 (2001); Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d 57, 60 (1998), cert. denied, 527 U.S. 1038 (1999), the following assignments of error, not having been briefed, are waived:

> "2. The court below erred in improperly limiting voir dire of the jury venire by the defense.
>
> "3. The court below erred in allowing the jurors be the judges of their own impartiality.
>
> "10. It was error for the court below to exclude Justin Wolfe's testimony that he had been told that Ian Wiffin had been indicted.
>
> "11. The court below erred in allowing the Commonwealth to lead its own witnesses.
>
> "12. The court below erred in allowing the Commonwealth to present evidence that it had not disclosed to the defense as required by the Discovery Order and Rule 3A:11 of the Rules of the Supreme Court of Virginia.
>
> "13. The Court below erred in allowing the Commonwealth to withhold exculpatory evidence, the withholding of which was revealed during the course of the trial, and which was producible in accordance with the court's order and the applicable laws regarding the prosecution's duty to provide

exculpatory evidence in order to ensure a fair trial and just outcome.

"21.  The court below erred by failing to instruct the jury on the necessity of and procedure for balancing the aggravating and mitigating factors.

"23.  The court below erred in its instructions on accessory before the fact, principle in the second degree, and concert of action.  These instructions were erroneous.

"30.  The court below erred by failing to set aside the verdict when there was evidence that at least one juror slept through part of the trial.

"31.  The court below erred by stating that the evidence presented at the judicial sentencing was not new evidence, and ignoring the new evidence presented for the first time at the judicial sentencing which included evidence of false and misrepresented facts in the Commonwealth's case.

"32.  The court below erred by not rejecting the jury recommendation of death and imposing a sentence of life without parole."

We will not consider assignment of error 37 because it is vague.  That assignment of error states:  "Such other grounds as may become evident through a more thorough examination of the record."  Rule 5:17(c).  The defendant does not assign any error to his non-capital convictions.  Accordingly, we will affirm those convictions.

V.

The defendant has raised two issues on appeal that have been decided adversely to his claims by our previous

19

decisions.  We adhere to those rulings, and we will not discuss them further.  The issues previously resolved are:

(i) whether the future dangerousness aggravator is unconstitutionally vague.  This argument was rejected in Bell v. Commonwealth, 264 Va. 172, 203, 563 S.E.2d 695, 716 (2002), cert. denied, ___ U.S. ___, 123 S.Ct. 860 (Jan. 13, 2003); Remington v. Commonwealth, 262 Va. 333, 355, 551 S.E.2d 620, 634 (2001), cert. denied, ___ U.S. ___, 122 S.Ct. 1928 (2002);

(ii) whether the vileness factor is unconstitutionally vague.  This argument was rejected in Morrisette v. Commonwealth, 264 Va. 386, 397, 569 S.E.2d 47, 55 (2002); Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997).

## VI.

The defendant argues that the circuit court erred in failing to remove for cause two members of the venire, Patricia Grisham and Leo Green.  The defendant claims that the circuit court should have removed these members of the venire for cause because of their exposure to media coverage of the crimes.  The defendant states:  "Juror Grisham remembered being baffled as to why young people under the age of 21, and not of legal drinking age, would be in a D.C. nightclub after it happened.  Juror Green said that he had read about it and heard about it on the radio.  He also recalled hearing about

20

the case the week before.  He specifically remembered the guy was killed, there was dope involved, and a stash of money was found."  The defendant claims there was "reasonable doubt" regarding these jurors' ability to give him a fair and impartial trial.

The defendant's contentions are without merit.  The circuit court and counsel conducted the voir dire of the venire.  Grisham stated that she had not acquired any information about the defendant's alleged criminal acts from the news media or other sources that would affect her impartiality in this case.  Grisham also stated that she did not "know of any reason whatsoever why [she] would not be able to give a fair and impartial trial to the Commonwealth and to the accused based solely on the evidence [she] would hear in this courtroom and the instructions of law" that the circuit court would give the jury.

Additionally, the following colloquy occurred between the Commonwealth's attorney and Grisham:

> "Commonwealth's Attorney:  This case involves the alleged distribution of drugs by some young people in Northern Virginia, one of whom was followed into this County and killed.
>
> "Do you think you have heard something about that?
>
> "Ms. Grisham:  I believe I read it in The Washington Post.

21

. . . .

  "Commonwealth's Attorney:  Irrespective of what you heard or read, would you be able to put that aside and render an opinion based solely on the evidence that you will hear in this courtroom and the law that the Court will give you?

  "Ms. Grisham:  Yes."

The following colloquy occurred between defendant's counsel

and Grisham:

  "Defense Counsel:  You indicated that you . . . read articles in The Washington Post.

  "Ms. Grisham:  Uh-huh.

  "Defense Counsel:  What do you remember of those articles when they came out?

  "Ms. Grisham:  I think the part that I remember the most is I believe that after it happened they were at a nightclub, I believe, I want to say the D.C. area.  And I think I remember their ages as being under twenty-one, a few of them.
  "And I was – in my mind I was thinking, why are they at a nightclub if they are not of legal drinking age?

. . . .

  "Defense Counsel:  Did those articles have any impact on your ability to – have you formed any opinions about this case?

  "Ms. Grisham:  No.

. . . .

  "Defense Counsel:  And you think you can be fair even in light of those articles?

  "Ms. Grisham:  Yes."

22

The following colloquy occurred between defense counsel and Green:

"Defense Counsel: Could you tell me what reports you heard, to the best of your recollection, or saw?

"Mr. Green: I don't remember any one in particular. I just heard it on the news. I heard about it and I read about it in the newspapers when it happened. And then I think last week or sometime when they brought it up again I heard it on the news.

"Defense Counsel: Do you have any recollection of any substance of the reports, or did you form any opinions?

"Mr. Green: No. The only thing I remember was that the guy was killed and there was dope involved in it and they found a stash of money in there with him. That's all I know about it.

"Defense Counsel: Do you think that you could set aside those facts and listen only to the testimony and evidence as presented during this trial?

"Mr. Green: Yes.

"Defense Counsel: Do you think you could forget about what you've heard in the media?

"Mr. Green: Yes."

In response to the court's question, "Have any of you acquired any information about these offenses or about the accused from the news media or other sources, and if so, would that information affect your impartiality in these cases?," Green responded, "I have read the newspapers and heard on the radio something about it." However, Green stated that he had

23

not "expressed or formed any opinions as to the guilt or innocence of the accused." Green also stated that he could put any information that he had read aside, listen to the evidence presented in the courtroom, and render his verdict based solely upon the evidence.

An accused has a constitutional right to an impartial jury. U.S. Const. amends. VI and XIV; Va. Const. art. I, § 8. Green v. Commonwealth, 262 Va. 105, 115, 546 S.E.2d 446, 451 (2001). Additionally, we have held that a prospective juror

> "must be able to give [the accused] a fair and impartial trial. Upon this point nothing should be left to inference or doubt. All the tests applied by the courts, all the enquiries made into the state of the juror's mind, are merely to ascertain whether [the juror] comes to the trial free from partiality and prejudice.
>    "If there be a reasonable doubt whether the juror possesses these qualifications, that doubt is sufficient to insure his exclusion. For, as has been well said, it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible."

Wright v. Commonwealth, 73 Va. (32 Gratt.) 941, 943 (1879); accord Green, 262 Va. at 115, 546 S.E.2d at 451; Barker v. Commonwealth, 230 Va. 370, 374-75, 337 S.E.2d 729, 732-33 (1985); Justus v. Commonwealth, 220 Va. 971, 976, 266 S.E.2d 87, 90-91 (1980).

Additionally, this Court must give deference to the circuit court's determination whether to exclude a prospective

24

juror because the circuit court was able to see and hear each member of the venire respond to the questions asked. The circuit court is in a superior position to determine whether a prospective juror's answers during voir dire indicate that the juror would be prevented from or impaired in performing the duties of a juror required by the juror's oath and the court's instructions. Green, 262 Va. at 115, 546 S.E.2d at 451; Lovitt v. Commonwealth, 260 Va. 497, 510, 537 S.E.2d 866, 875 (2000), cert. denied, 534 U.S. 815 (2001). This Court must consider the voir dire as a whole, and not simply the juror's isolated statements. Clagett v. Commonwealth, 252 Va. 79, 90, 472 S.E.2d 263, 269 (1996), cert. denied, 519 U.S. 1122 (1997). And, we will not disturb the circuit court's refusal to strike a juror for cause unless that decision constitutes manifest error. Green, 262 Va. at 116, 546 S.E.2d at 451; Clagett, 252 Va. at 90, 472 S.E.2d at 269; Roach v. Commonwealth, 251 Va. 324, 343, 468 S.E.2d 98, 109, cert. denied, 519 U.S. 951 (1996).

Applying the aforementioned principles, we hold that the circuit court did not abuse its discretion when it refused to grant the defendant's motion to strike Grisham and Green. Our review of the entire voir dire of Grisham and Green, including their statements summarized above, indicates that these jurors' ability to give the defendant a fair and impartial

25

trial was not left to inference or doubt.  Both Grisham and Green stated that they could put aside any information that they had read or heard and give the defendant a fair trial based solely upon the evidence admitted during the trial and the jury instructions that the court would give to the jury.  And, as the Supreme Court has held, the federal Constitution does not require that a court disqualify a juror simply because that juror has been exposed to media coverage.  Mu'Min v. Virginia, 500 U.S. 415, 430 (1991).  Accord Murphy v. Florida, 421 U.S. 794, 799-800 (1975); Irvin v. Dowd, 366 U.S. 717, 722-23 (1961).

## VII.

### Guilt Phase

#### A.

During the guilt phase of the capital murder trial, the Commonwealth presented several witnesses who testified that the defendant had planned to rob drug dealers.  The defendant argues that "[t]his evidence was only admissible if it was being used to prove felony murder" but that "the Commonwealth relied on this evidence to prejudice the jury against Mr. Wolfe."  We will not consider this argument because the defendant did not object to the admission of this evidence at trial.  Rule 5:25.

#### B.

The defendant claims that the circuit court erred because it purportedly "permitted a lay witness to express an opinion about what she thought might have happened on the night of the offense."  Not only does the defendant mischaracterize Janelle Johnson's testimony, but the defendant failed to make any objection to such purported testimony and, therefore, we will not consider this argument.  Rule 5:25.

C.

The defendant argues that the circuit court erred because it permitted witnesses Chad Hough and Jason Coleman to violate the rule on the exclusion of witnesses, and the court failed to strike Hough's testimony.  The defendant claims that even though the court granted a joint motion by the defendant and the Commonwealth to exclude the witnesses pursuant to Code § 19.2-265.1, Hough and Coleman violated that order.  The defendant says that his counsel spoke with Coleman after Hough had testified during the trial.  Allegedly, Hough discussed with Coleman, in detail, defense counsel's cross-examination of Hough.

Continuing, the defendant states that "[e]ven though the Commonwealth did not call Coleman as a witness, the impropriety prevented the defendant from calling him and getting his unfettered answers and/or surprised reaction.  It put the defense in the position of having to cross-examine

27

[its] own witness had Coleman not answered with the anticipated response. To balance the impact of having Hough's testimony alone, [Coleman's] testimony should have been stricken."

The circuit court denied the defendant's motion for a mistrial. The court stated that neither Hough nor Coleman was in the courtroom when the court granted the motion to exclude witnesses. The court concluded: "It would be awful hard for this Court to find any intentional impropriety simply because these witnesses were not here to receive the Court's order. And indeed, the Commonwealth may have talked to these witnesses, but you [defense counsel] talked to the witnesses also because you said you actually called the witness, Mr. Coleman, and talked to him."

Code § 19.2-265.1 requires a circuit court to exclude witnesses from the courtroom upon the motion of any litigant. We have held that a circuit court has discretion to decide whether a witness who violates an exclusion order should be prohibited from testifying. Brickhouse v. Commonwealth, 208 Va. 533, 537, 159 S.E.2d 611, 614 (1968). "Factors to be considered in resolving the question include whether there was prejudice to the defendant and whether there was intentional impropriety attributable to the prosecution. It is also pertinent whether the out-of-court comments concerned any

28

substantive aspect of the case and whether they had any effect on the witness' testimony." Bennett v. Commonwealth, 236 Va. 448, 465, 374 S.E.2d 303, 314 (1988), cert. denied, 490 U.S. 1028 (1989).

Applying our precedent, we hold that the circuit court did not abuse its discretion when it denied defendant's motion for a mistrial. The defendant failed to establish that he was prejudiced, and he failed to show any intentional impropriety attributable to the Commonwealth. And, as we have already stated, the circuit court found that neither Hough nor Coleman was aware of its ruling that excluded the witnesses.

D.

The defendant argues that the Commonwealth's evidence established that he was guilty of the crime of felony murder, not capital murder. The defendant states that Ian Wiffin, whom the defendant describes as a key witness for the Commonwealth, testified that the defendant told Wiffin after the crimes had occurred that Barber "was supposed to rob [the victim], but he messed it up and ended up killing him." Continuing, the defendant contends that at the very least, the Commonwealth's evidence established reasonable doubt whether the defendant hired Barber to kill the victim. The defendant's contentions lack merit.

The jury in this case was properly instructed by the court to consider all the evidence. Our review of the record in this case reveals that the Commonwealth presented evidence that permitted the jury to find beyond a reasonable doubt that the defendant hired Barber to kill Daniel Petrole. Barber testified that the defendant paid him to kill Petrole. Pursuant to the terms of the agreement, the defendant agreed to pay Barber $10,000 in cash, he forgave Barber's prior drug debts and gave Barber a half pound of marijuana. The defendant and Barber stalked the victim on numerous occasions in an effort to kill him. The defendant devised a plan to lure the victim to the defendant's girlfriend's apartment so that Barber could then follow the victim and execute him at the appropriate time. After Barber killed the victim, Barber called the defendant. Barber and the defendant met at a club, and the defendant boasted that he just made a "rack of cake," a slang expression for "a lot of money." And, Barber's version of the murder-for-hire scheme is consistent with the testimony of numerous other witnesses. Moreover, contrary to the defendant's assertion, the jury was not required to accept as true his self-serving statements that he made after the murder that Barber "messed it up and ended up killing [Petrole]."

E.

30

Hough and Ian Wiffin, who testified on behalf of the Commonwealth, stated that criminal charges were pending against them in the federal district courts for possession and distribution of drugs. Hough had executed a plea agreement with a United States Attorney in West Virginia that provided a maximum punishment of 20 years imprisonment. Pursuant to the terms of the agreement, the United States Attorney was required to make "nonbinding recommendations" to the federal district court for reductions in Hough's sentence based upon his cooperation with federal law enforcement agencies. Hough testified at trial that he hoped that the federal district court would reduce his sentence based on his cooperation and testimony in the defendant's capital murder trial.

Wiffin had been indicted by a federal grand jury in Virginia. He testified that his lawyer had advised him that his testimony "might help" Wiffin in his federal criminal proceedings. A draft of a plea agreement had been prepared, but no agreement had been executed between Wiffin and the United States Attorney.

At trial, the defendant tried to present testimony from an attorney who considered himself an expert on the subject of federal sentencing guidelines. The circuit court refused to permit this purported expert witness to testify because, among other things, such testimony would have been pure speculation.

We agree with the circuit court, and we hold that the court did not abuse its discretion when it refused to permit such testimony.  The plea agreement that Hough had executed with a United States Attorney simply provided that the United States would make nonbinding recommendations on his sentence based upon his cooperation with federal authorities.  No one, including the so-called expert witness, could opine what sentence the federal district court would ultimately impose upon Hough.  Wiffin had not yet signed a written agreement with a United States Attorney in Virginia.  Accordingly, any so-called expert testimony on this subject would have been utter speculation and, thus, inadmissible.  As we have recently stated, expert testimony that is speculative is not admissible.  John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002).

VIII.

A.

Penalty Phase

Code § 19.2-264.2 states:

"In assessing the penalty of any person
convicted of an offense for which the death penalty
may be imposed, a sentence of death shall not be
imposed unless the court or jury shall (1) after
consideration of the past criminal record of
convictions of the defendant, find that there is a
probability that the defendant would commit criminal
acts of violence that would constitute a continuing
serious threat to society or that his conduct in

32

> committing the offense for which he stands charged
> was outrageously or wantonly vile, horrible or
> inhuman in that it involved torture, depravity of
> mind or an aggravated battery to the victim; and (2)
> recommend that the penalty of death be imposed."

The defendant argues that the evidence is insufficient as a matter of law to establish his future dangerousness. The defendant states that he has never been charged with, involved in, or convicted of any violent or assaultive crime. He states that his prior record of simple possession of marijuana, possession of a false identification, and obtaining alcohol while under the age of 21 is insufficient to prove his future dangerousness. Additionally, he says that the key evidence upon which the Commonwealth relied to prove future dangerousness involved a student who brought a razor blade and syringes to school in violation of school rules. The defendant's brother, not the defendant, was guilty of that infraction. We disagree with the defendant's contentions that the evidence is insufficient to prove that he is a future danger.

Based upon our review of the record, we hold that the evidence of record permitted the jury to find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society. Contrary to the defendant's assertion, it is not necessary that he have a prior criminal record as a predicate

33

on which the jury must rely before it can sentence him to death based on future dangerousness.  <u>Kasi</u>, 256 Va. at 423, 508 S.E.2d at 66; <u>Goins v. Commonwealth</u>, 251 Va. 442, 467, 470 S.E.2d 114, 130-31, <u>cert.</u> <u>denied</u>, 519 U.S. 887 (1996); <u>Breard v. Commonwealth</u>, 248 Va. 68, 86, 445 S.E.2d 670, 681, <u>cert.</u> <u>denied</u>, 513 U.S. 971 (1994); <u>Murphy v. Commonwealth</u>, 246 Va. 136, 144, 431 S.E.2d 48, 53, <u>cert.</u> <u>denied</u>, 510 U.S. 928 (1993).

The evidence of record establishes, beyond a reasonable doubt, that this defendant is a future danger to society.  The defendant was a major drug dealer in Northern Virginia.  He had been a major drug dealer for four or five years before March 15, 2001, the date he arranged for the murder of his supplier.  He admitted that he sold over 100 pounds of marijuana, and he purchased between eight and 18 pounds of marijuana every two weeks from the victim.

Prior to this murder, the defendant had spoken with others and discussed committing robberies of drug suppliers.  For example, Hough testified that he and the defendant "talked about performing robberies most of the time.  Almost every time we got together, it was usually some type of robbery connected with drugs."  Additionally, Hough stated that "[i]t was usually like maybe holdup styles, as far as whether – I remember one time it was – Justin would go to make a buy.  We

would go in and tie them up and beat them up and take the drugs and money . . . ."

The evidence also showed that the defendant and another friend, Coleman, purchased ski masks and duct tape in furtherance of a plan to rob a drug dealer.  The defendant and Hough discussed robbing a drug dealer who lived in Washington, D.C., but they abandoned their plan because the defendant concluded that the level of security in the apartment building where the intended victim lived was too extensive.

The evidence showed that this defendant devised a plan whereby he lured Petrole, his major drug supplier, to a specific location in Virginia.  The defendant paid his longtime friend, Barber, to follow Petrole, and then execute him because Petrole knew too many people.  The defendant directed Barber to kill Petrole, stating, "we got to shoot him because he knows too many people."  The evidence also showed that prior to the actual murder of Petrole, the defendant and Barber had made several other attempts to locate and kill Petrole.  Certainly, these acts are sufficient to support the jury's finding beyond a reasonable doubt that there is a reasonable probability that this defendant is a future danger to society.  Additionally, the fact that soon after Petrole was killed, the defendant celebrated at a party and drank a

35

toast in honor of the murder is indicative of the danger he poses to others.

B.

The defendant argues that Code § 19.2-264.2 does not permit him to be sentenced to death based upon the vileness predicate because the vile acts of Barber cannot be attributed vicariously to the defendant. Additionally, the defendant argues that the evidence was not sufficient to establish vileness. We need not, and expressly do not, consider these arguments because the defendant was sentenced to death based upon the vileness predicate as well as the future dangerousness predicate. The future dangerousness predicate is a separate and independent basis to support the imposition of the death penalty, and as we have already discussed, the evidence was sufficient to establish that the defendant constituted a continuing serious threat to society.

IX.

During the penalty phase of the trial, the jury, as required by our decision in Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999), cert. denied, ___ U.S. ___, 122 S.Ct. 1925 (2002), was instructed that it could sentence the defendant to life imprisonment, life imprisonment and a fine, or death, and that: "the words 'imprisonment for

36

life' mean imprisonment for life without possibility of parole."

After the jury began to deliberate on the appropriate punishment, the jury submitted several questions to the circuit court. Among other things, the jury asked the following questions: "Does life imprisonment mean that the defendant will never be released from prison by any means?" The court, out of the jury's presence, informed counsel as follows:

> "The Court has not considered this a parole question because [the jury] didn't mention the word parole. It says by any means and this gets into areas of executive clemency and the other means, because obviously [the jury] said any means.
> "So I don't think the Court – it's [in]appropriate for me to address the question one way or the other."

The defendant's counsel stated that the court should instruct the jury that parole had been abolished. The court responded:

> "I think [the jury has] been informed . . . in the instruction that [the jury has] already received, which says that life imprisonment means imprisonment for life without the possibility of parole.
> "That instruction [the jury has] and I notice this question did not mention parole. This is not a parole question. . . .
> "I think obviously what [the jury is] talking about is any means and we're talking about like executive clemency, for example, or any other means that may be available and I think it's inappropriate to be addressed at this time."

37

The circuit court instructed the jury that it must proceed on the instructions that the jury had already received from the court.

The jury began to deliberate further.  Subsequently, the jury submitted another written question to the court:  "In the instructions it says 'life means life' – what is the definition of life?"  The court responded:  "The instruction you received says 'The words "imprisonment for life" mean imprisonment for life without possibility of parole.' "  The defendant objected to the court's response and suggested that the word "life" means "Justin Wolfe's natural life."  The court responded:

> "That could be misleading because that's not what it means in that instruction . . . .  You do have executive clemency, you do have geriatric parole.  So obviously if we take that definition [of Justin Wolfe's natural life] that's not accurate.
> "What the Court has proposed is simply to tell them to go back and read the definition – the instruction because the instruction didn't say life means life, first of all.  The instruction says the words imprisonment for life mean imprisonment for life without the possibility of parole.  That's the instruction that comes from our 1999 Yarbrough v. Commonwealth case that our Supreme Court says was the proper instruction to be given when requested by defense counsel.
> "If we expand that, I think we're going into areas that simply would not be accurate."

The defendant argues that the circuit court should have instructed the jury that "imprisonment for life means Justin

38

Wolfe's natural life."  We disagree with the defendant's contentions.

In Bell, supra, a jury in the trial of a capital murder case was instructed regarding the definition of imprisonment for life as mandated by our decision in Yarbrough.  The jury asked the circuit court, " 'Understanding that imprisonment for life means no possibility of parole, is there any other way to be released from prison?' "  The court instructed the jury that it " 'would have to rely on the evidence that [it] heard, and the instructions already presented in deciding the punishment.' "  The circuit court in Bell concluded that a more detailed answer to the jury's question would have required the court to discuss matters that were speculative and inappropriate for the jury to consider.  264 Va. at 204, 563 S.E.2d at 716.

In Bell, we stated that the question that the jury asked

"was general and could not have been accurately answered without telling the jury about executive clemency or pardon.  Yet, we have never allowed a jury to have that information because of the potential for jury speculation resulting in a harsher sentence than would otherwise be warranted.
"So, the only response that would have comported with our precedent was to instruct the jurors that geriatric release and sentencing credits were not available to Bell and that they should not concern themselves with anything else.  Yet, that kind of response would have suggested that there is some other form of early release still available to Bell and would have, in fact, invited the jury to speculate. . . .  Such speculation is 'inconsistent

39

with a fair trial both to the defendant and the Commonwealth.' "

Id. at 207-08, 563 S.E.2d at 718. We concluded in Bell that the circuit court did not err when it directed the jury to rely on the evidence that it had heard and the instructions that it had been given because any other response would have either been inaccurate or would have led to speculation by the jury.

Our holding in Bell requires a similar conclusion in this appeal. Had the circuit court instructed the jury, as requested by the defendant, that natural life meant the natural life of Justin Wolfe, such response would have been inaccurate because, just as in Bell, that response would have negated the possibility of early release through an act of executive pardon or clemency. These possibilities are inappropriate for a jury to consider because such information could cause the jury to speculate, and such speculation might result in a harsher sentence than would otherwise be warranted. Accordingly, we hold that the circuit court did not err when it denied the defendant's request for a jury instruction that life means the natural life of Justin Michael Wolfe.

X.

40

The defendant argues, in a very conclusional fashion, that he was somehow deprived of his right to due process because of Rule 1:1.  The defendant's contention lacks merit.

Rule 1:1 states in part:

"All final judgments, orders, and decrees, irrespective of terms of court, shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer.  But notwithstanding the finality of the judgment, in a criminal case the trial court may postpone execution of the sentence in order to give the accused an opportunity to apply for a writ of error and supersedeas; such postponement, however, shall not extend the time limits hereinafter prescribed for applying for a writ of error."

Even though the defendant asserts that the circuit court refused to grant him an evidentiary hearing within the 21 days after a witness purportedly recanted her testimony, the defendant does not demonstrate how he was deprived of any right of due process.  Our review of the record shows that the circuit court considered and denied all the defendant's post-trial motions in a timely manner and that Rule 1:1 was not implicated in the proceedings below.

XI.

The defendant argues that the Commonwealth's attorney "misstated both the facts and the law to the jury." Continuing, the defendant asserts that the Commonwealth presented "false evidence about a school incident."  The

41

defendant also argues that the Commonwealth asked the jury during its closing argument "to impose the death sentence in order to 'send a message' to those who would consider getting involved in drugs and told the jury that Mr. Wolfe may not stay in prison.  These false statements about the facts and the law individually, and in combination, denied Mr. Wolfe a fair trial."

The defendant's contentions regarding the closing argument are without merit.  The defendant did not object to the Commonwealth's closing argument and, therefore, he may not raise objections to this argument for the first time on appeal.  Rule 5:25.

During the cross-examination of several of the defendant's witnesses during the penalty phase of the trial, the Commonwealth's attorney asked those witnesses about an incident that occurred when the defendant allegedly took razor blades and syringes to school when he was in parochial school. For example, the Commonwealth asked the defendant's stepmother the following:

> "Q:  How many conversations do you think you had with the [defendant's parochial school] principal there?
>
> "A:  I only remember having one.
>
> "Q:  Only one?

"A: And I don't even remember what it was about.

"Q: And you don't remember that being about him bringing razor blades and syringes to school?

"A: Now that you mention it, I do, but I had forgotten it.

"Q: Oh, I see. You do remember that occurred. And you do remember going down there and pleading with the principal to please let [the defendant] stay in school there?

"A: I don't remember pleading.

"Q: What do you remember, ma'am?

"A: I'm sorry. I remember having a discussion with the principal. . . . I was concerned.

"Q: Do you remember that that was what the problem was, that he had brought razor blades and syringes into the school?

"A: Yes."

Michael W. Wolfe, the defendant's father, testified that the defendant did not take razor blades and syringes to school when he was in the eighth grade, but that his brother, Wesley J. Wolfe, had done so. Even though the Commonwealth vigorously cross-examined the defendant's father on this point, the defendant's father consistently stated that Wesley Wolfe, not Justin Wolfe, had taken the razor blades and syringes to school. The defendant's mother, Theresa Steinberg, also testified that Wesley Wolfe, who was a fourth-grade student at the time the incident occurred, found a bag

43

of razor blades and syringes and took them to school, and that the defendant had no involvement in that incident.  Wesley Wolfe testified that he, not the defendant, took the razor blades to school when he was in the fourth grade.

Marilyn S. Valatka, principal of the school that the defendant attended, testified during the penalty phase that according to her recollection, the defendant brought to school a small package of razor blades and a couple of plastic syringes, not needles.  However, several months after the jury had sentenced the defendant to death, the defendant presented an affidavit from Ms. Valatka, who claimed that she was mistaken about her testimony that the defendant brought the razor blades and syringes to school.  The circuit court refused to consider the affidavits.  The court stated:  "I think we should not proceed on the affidavits at this time because those witnesses could have been present for the Court to consider and are not.  So I'm not going to proceed on affidavits."  The defendant did not assign error to the circuit court's ruling.  The affidavits upon which the defendant relies to make his argument are not a part of the record before this Court and, therefore, we will not consider them or the defendant's related arguments based upon those affidavits.

XII.

44

The defendant argues: "The indictment charging Justin Wolfe with capital murder is defective as a matter of law. The grand jury failed to vote on the aggravators in [Code] §§ 19.2-264.3 and .4 which are necessary for consideration of the death penalty, and did not reference by words or citation the required predicate facts that must be proved beyond a reasonable doubt before the death penalty may even be considered as a possible punishment. These factors are elements . . . in a separate statute which was not considered by the grand jury and they were not a part of the indictment."

The defendant's contentions challenge the content and sufficiency of the indictment. However, the defendant did not raise his contentions in the circuit court until several months after the jury had returned its verdict. We will not consider the defendant's contentions because he failed to raise those contentions in a timely manner.

Rules 3A:9(b) and (c) mandate that a defense "based on defects in the institution of the prosecution or in the written charge upon which the accused is to be tried" must be raised "before a plea is entered" or "at least 7 days before the day fixed for trial." Pursuant to this Rule, failure to make a timely defense constitutes a waiver, except for jurisdictional defects, which are not present in this appeal. Additionally, this Court has consistently and repeatedly held

that generally a defendant must challenge the sufficiency of an indictment before the jury's verdict, or the alleged defect is waived.  See Stamper v. Commonwealth, 228 Va. 707, 713, 324 S.E.2d 682, 686 (1985); Washington v. Commonwealth, 216 Va. 185, 192, 217 S.E.2d 815, 822 (1975); Guthrie v. Commonwealth, 212 Va. 550, 551, 186 S.E.2d 26, 28 (1972); McDougal v. Commonwealth, 212 Va. 547, 549, 186 S.E.2d 18, 20 (1972); Forester v. Commonwealth, 210 Va. 764, 767, 173 S.E.2d 851, 854 (1970); Council v. Smyth, 201 Va. 135, 138, 109 S.E.2d 116, 119 (1959); Bailey v. Commonwealth, 193 Va. 814, 822, 71 S.E.2d 368, 372 (1952); Honaker v. Commonwealth, 136 Va. 752, 754, 118 S.E. 85, 86 (1923); Flanary v. Commonwealth, 133 Va. 665, 666, 112 S.E. 604, 604 (1922); Burgess v. Commonwealth, 4 Va. (2 Va. Cas.) 483, 488 (1825).

## XIII.

### Passion and Prejudice

Code § 17.1-313(C)(1) requires that this Court determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."  The defendant argues that his sentence of death was imposed under the influence of passion, prejudice, and other arbitrary factors.  He claims that the jury was prevented from considering all the evidence in a fair manner because of the purported false argument by the Commonwealth's attorneys, the

46

admission of victim impact testimony that did not fall within the parameters of the statute authorizing such testimony, and the admission of unadjudicated prior conduct when the Commonwealth purportedly did not provide notice of its intent to rely on such evidence.  We disagree with the defendant's contentions.

First, we have reviewed the Commonwealth's closing argument during the penalty phase of the trial, and we find no statements in the closing argument that would have inflamed the jury.  The circuit court properly permitted the victim's mother to testify about the impact that the murder of her son has had upon her family because such testimony is within the scope of Code §§ 19.2-299.1 and 19.2-264.4.

The defendant complains that the Commonwealth asked improper questions of certain witnesses that improperly inflamed the jury.  The Commonwealth asked a friend of the defendant who testified at trial whether he knew that the defendant was a drug dealer, and whether he knew about the "hundreds of thousands of dollars that was flowing through [the defendant's] house on a weekly basis," and the witness responded, "no."  The defendant's father was also asked during cross-examination in the penalty phase whether he knew that his son made hundreds of thousands of dollars selling drugs, and the father responded, "no."  The defendant's brother,

47

Wesley Wolfe, was also asked by the Commonwealth whether he knew that the defendant "had plenty of money, hundreds of thousands of dollars," and the brother responded, "no." Contrary to the defendant's assertions, we hold that these questions did not inflame the jury. In fact, there is evidence in this record from which the jury could have found that the defendant was involved in the purchase and sale of hundreds of thousands of dollars worth of illegal drugs.

The defendant contends that the sentence of death was imposed based upon the influence of passion, prejudice, or other arbitrary factors because the Commonwealth stated that the defendant had a history of violence. The defendant claims that the Commonwealth's statement regarding his "history of violence" was based upon an incident that involved a student who took a razor blade and syringes to school in violation of school policies. The defendant claims that his brother was the individual who was involved in this incident.

We have reviewed the Commonwealth's closing argument in the penalty phase of the trial, and the Commonwealth simply does not refer to this incident. The Commonwealth's reference to the defendant's history of violence pertained to the defendant's prior efforts to enlist others to rob drug dealers. For example, the Commonwealth stated:

"You heard [Janelle] Johnson say her husband, or ex-husband, whatever the status of their marriage is today, was one of [the defendant's] confederates. They talked on the phone about robbing people. They talked about robbing Matt Chevlin.

"They took the weapon which you've seen . . . her gun . . . and they would go out to collect drug debts.

"That is not violent? Now, he didn't have a gun in his possession. He went along with Mr. Coleman, because Mr. Coleman is his confederate, because he is not the type of person, from all of the evidence that would actually take the gun and commit the act.

"No, he's the type of person who would direct someone to do it."

We have reviewed the entire record as required by Code § 17.1-313(C)(1), and we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

XIV.

Excessiveness and Proportionality

Code § 17.1-313(C)(2) requires this Court to consider and to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." Hedrick v. Commonwealth, 257 Va. 328, 342, 513 S.E.2d 634, 642, cert. denied, 528 U.S. 952 (1999). Accord Murphy v. Commonwealth, 246 Va. 136, 145, 431

49

S.E.2d 48, 54, <u>cert.</u> <u>denied</u>, 510 U.S. 928 (1993) (quoting <u>Stamper v. Commonwealth</u>, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), <u>cert.</u> <u>denied</u>, 445 U.S. 972 (1980)).

The defendant argues that his sentence is excessive when compared to similar cases. We have examined the records of all capital murder cases reviewed by this Court when, as here, the death penalty was based upon murder for hire. <u>Williams v. Commonwealth</u>, 252 Va. 3, 472 S.E.2d 50, <u>cert.</u> <u>denied</u>, 519 U.S. 998 (1996); <u>Murphy</u>, 246 Va. 136, 431 S.E.2d 48; <u>Stockton v. Commonwealth</u>, 227 Va. 124, 314 S.E.2d 371, <u>cert.</u> <u>denied</u>, 469 U.S. 873 (1984); <u>Clark v. Commonwealth</u>, 220 Va. 201, 257 S.E.2d 784 (1979), <u>cert.</u> <u>denied</u>, 444 U.S. 1049 (1980). Even though no two capital murder cases are identical, we are confident that given the special heinousness associated with the murder for hire in this particular case, the sentence of death is neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in this Commonwealth for crimes of a similar nature considering the crime and this defendant.

XV.

We have considered all the defendant's remaining arguments, and they are without merit. Having reviewed the sentence of death, finding no reversible error in the record,

50

and perceiving no reason to commute the death sentence, we will affirm the judgment of the circuit court.

Affirmed.