COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, AtLee and Senior Judge Haley
Argued by videoconference

JOHN CRESCENT NDUNGURU

v.      Record No. 0855-20-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE JAMES W. HALEY, JR.
AUGUST 3, 2021

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

Crystal A. Meleen (Keats & Meleen, PLC, on brief), for appellant.

Maureen E. Mshar, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

In a bench trial, defendant was convicted of five counts of felony making a false

statement in application for Medicaid payments for medical assistance, in violation of Code

§ 32.1-314, and five counts of felony obtaining money by false pretenses, in violation of Code

§ 18.2-178. The trial court sentenced him to twenty years in the penitentiary with fifteen years

suspended.

The assignment of error reads as follows: "[t]he trial court erred in allowing a

Commonwealth witness to testify after that witness observed the testimony of another

Commonwealth witness following the court's invocation of the rule on witnesses when the

Commonwealth failed to show that its error had not prejudiced the defendant."[1]

---

[1] See Code § 19.2-265.1; Va. R. Evid. 2:615.

FACTS

The defendant owned and operated Mercy Services ("Mercy"), which provided long-term medical care for patients after discharge from a hospital. To be paid for such care the Virginia Department of Medical Assistance Services (DMAS), which oversees the taxpayer funded Virginia Medicaid program, requires the provider to submit, in essence, two forms: A DMAS (also called a DMAS-96) authorization form, which is required for long-term care paid by Medicaid, and a Uniform Assessment Instrument (UAI), which defines what level, and what duration, of long-term care a patient requires. The signature of the patient's primary care physician is required on the UAI form to attest to the accuracy of the patient's hospital admission, treatment plan, and approval of criteria for long-term care services.

At the beginning of the trial, upon motion, the trial court invoked and explained the rule on excluding witnesses (hereafter "the rule") and those witnesses who were present departed the courtroom. A Commonwealth investigator, who knew all Commonwealth witnesses by sight, was tasked with informing late-arriving witnesses of the rule. This investigator, stationed in the hallway outside the courtroom, received a message that her spouse had suffered a life-threatening medical emergency, and she departed the courthouse. Although a second Commonwealth investigator was assigned, that investigator did not know a late-arriving Commonwealth witness, Alice George. George entered the courtroom and heard a portion of the testimony of Jerry St. Louis. When the prosecuting attorneys realized George was present, they immediately advised the trial court of that fact. The court advised her of the rule, and she departed.

George had not been present when the court initially invoked and explained the rule. There is no evidence in the record that either the Commonwealth or George intentionally violated the rule, a point conceded by the defense at trial.[2]

St. Louis was the first Commonwealth witness; as here relevant, he testified that he had been a case manager at the Virginia Hospital Center, where he had encrypted access to hospital records. He admitted and discharged patients who received long-term care through Medicaid. As part of his duties, he completed UAI and DMAS forms. Defendant paid him cash to complete the UAI forms with false names, dates of birth, caregiver information, physician information, notes provided by Mercy nurse employees, and information regarding patient diagnosis and treatment, all provided by defendant. The defendant himself signed the portion of the form requiring the physician's signature. Thus, Medicaid paid money to Mercy for non-existent individuals. His actions discovered, St. Louis had become a Commonwealth witness after entering into a cooperation agreement with the Commonwealth.

For trial, the Commonwealth had obtained the false UAI and DMAS documents, as related to each false patient. To aid in their identification and admission into evidence, each was numbered and projected upon a screen in the courtroom. St. Louis identified each individual document as it was progressively shown on the screen, Commonwealth's exhibits 9 to 52.

---

[2] The trial court:

> I think there are two categories of cases; one was when I guess, the Commonwealth fails to ensure that the witness doesn't come into the courtroom; and another one is where the Commonwealth actively participates or takes affirmative action to violate the rule. And we don't have that here; right? We don't have that.

Defense counsel: "I don't have any reason to believe that."

The trial court conducted a hearing concerning the circumstances of George's presence in the courtroom, the extent of the overheard St. Louis testimony, and the possibility of that testimony adulterating her later testimony. Clarification of the issue to be determined requires a summary and recital of portions of that testimony at that hearing.

George testified that she arrived at the courthouse around 10:00 a.m. and waited in the hallway until about 11:00 a.m., when she entered the courtroom. She was not present when the rule was invoked. She told no one she was present. No one told her to wait outside. When she entered the courtroom, a man was testifying. She did not know him and had never seen him before. She took no notes. She was in the courtroom about twenty minutes. A "guy" (later identified as a Commonwealth investigator) whom she had never seen before, told her to leave the courtroom. George was called as a witness by the defense:

> Q. And what did you hear?
>
> A. . . . the guy was testifying about the -- what we have today. And at the time I came in he was testifying about the paperwork something. He was showing the screen.
>
>   . . . .
>
> Q. So do you remember the substance of what he said?
>
> A. Not really.
>
> Q. Well what do you remember?
>
> A. I remember the top page. He was discussing about the first top page. I also remember the name of the client and some demographic information.
>
>   . . . .
>
> Q. And what do you remember him testifying to about the demographics I think you said?

A. I remember he talked about the paperwork that he – he kind of – he is the one who – I don't know – I don't – specifically I don't understand, but he said he dealt with the paper – the paperwork . . .

The Commonwealth cross-examined George:

Q. Is that the full extent of what you heard – what you just described?

A. Yes, sir.

Q. About one document?

A. Two. There were – the top page and the – the other page.

. . . .

Q. So the first page of the UAI and the first page of the DMAS-96; is that correct?

A. Yes.

Q. Did you hear anything beyond that that you remember?

A. I don't remember. That's what I remember.

. . . .

Q. . . . Would you change your testimony at all based on what you heard yesterday?

A. I'm not sure if it will influence negatively or positively because I dealt with the paperwork. So I'm not really sure how it's going to influence.

Q. Would you be able to exclude what you heard and testify honestly?

A. Maybe yes; maybe no.

The Commonwealth then asked six times about aspects of her work at Mercy and whether she could testify honestly about the same. George replied affirmatively to each question.

It is clear from the testimony that George had heard St. Louis identifying one of the 9 to 52 exhibits offered by the Commonwealth, and nothing more.

After hearing argument encompassing each of the cases quoted below and after reviewing George's testimony in detail, specifically relying on <u>Young v. Commonwealth</u>, No. 1744-17-1 (Va. Ct. App. Oct. 30, 2018), the trial court held: "[s]o at this point we don't – the [c]ourt does not have evidence that [the overheard testimony] has shaped or had an adulterating effect on her testimony so as to unfairly prejudice the defendant."

The court reserved the right of the defense to again raise the issue following George's later testimony. The substance of that testimony was as follows. George worked at Mercy as a nurse assistant from October 2016 through December 2018. Her job responsibilities included submitting UAI forms to DMAS. George recognized the UAI forms identified as Commonwealth's exhibits 9-52. After a Mercy nurse went to see a patient, the nurse would bring patient paperwork back and give it to George. With that paperwork in hand, George would complete the "final touches" and questionnaires and submit the UAI to DMAS for authorization for payment. At some point, defendant himself directed George to use information on the UAIs to complete the questionnaires without the nurse present, because the nurses' paperwork was missing. George noticed that information from the nurses was not consistent, or "correlating," with information on the UAIs. Sometimes, the nurses returned client information after the UAIs had been submitted for payment. After researching Medicaid regulations, George learned that what she was doing was "not good" and reported it the Federal Bureau of Investigation.

As a result of these fraudulent authorizations, the evidence shows that, through Mercy, the defendant received $2.7 million.

Following George's testimony in chief, defendant renewed the argument to exclude her testimony. Relying again on the language of <u>Young</u>, the trial court stated:

> the [c]ourt finds that there is not evidence that [George's]
> testimony was shaped by her exposure or that she adulterated her
> testimony by her exposure to Mr. St. Louis's testimony, such as it

is. Furthermore, there does not appear to be unfair prejudice in this case . . . so I find that my original ruling remains proper.

ANALYSIS

The law concerning the issue before us is as follows:

> Factors to be considered in resolving the question include whether there was prejudice to the defendant and whether there was intentional impropriety attributable to the prosecution. It is also pertinent whether the out-of-court comments concerned any substantive aspect of the case and whether they had any effect of the witness' testimony. See United States v. Buchanan, 787 F.2d 477, 485 (10th Cir. 1986). In Huddleston v. Commonwealth, 191 Va. 400, 405 (1950), we explained that "the purpose of excluding the witnesses from the courtroom is, of course, to deprive a later witness of the opportunity of shaping his testimony to correspond to that of the earlier one."

Bennett v. Commonwealth, 236 Va. 448, 465 (1988).

This Court has addressed this issue and held that it was an abuse of the trial court's discretion to exclude testimony where "[t]here was no showing that [a witness'] presence in the courtroom influenced his testimony" after an unintentional violation of an exclusion order. Jury v. Commonwealth, 10 Va. App. 718, 721 (1990). In Young, under circumstances similar to the case at hand, this Court found that "[t]he record does not indicate any conformity of testimony except perhaps regarding the title of and the general content contained in the spreadsheets. . . . Thus, there is no evidence that the brief conversation shaped, or had an adulterating effect on [the witness'] testimony . . .". No. 1744-17-1, slip op. at 8-9.

The trial court found as a fact that George had not adulterated her testimony as a result of what she overheard of St. Louis's testimony. Without adulteration there can be no prejudice to a defendant.

"To properly review the trial court's application of the law to the facts, 'we give deference to the trial court's factual findings and view the facts in the light most favorable to . . . the prevailing

party below.'" Stone v. Commonwealth, 297 Va. 100, 102 (2019) (quoting Kim v. Commonwealth, 293 Va. 304, 311 (2017)). We here give that deference to the trial court's finding of fact concerning George's testimony and the absence of any adulteration of that testimony.

Accordingly, the issue thus narrows to resolve whether the trial court abused its discretion in permitting George's testimony. "[A] [trial] court has discretion to decide whether a witness who violates [a rule on witnesses] should be prohibited from testifying." Wolfe v. Commonwealth, 265 Va. 193, 214 (2003) (citing Brickhouse v. Commonwealth, 208 Va. 533, 537 (1968)).

Most recently, the Virginia Supreme Court enunciated the parameters of that discretion.

> When we say that a circuit court has discretion, we mean that "the [circuit] court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Landrum v. Chippenham and Johnston-Willis Hosps, Inc., 282 Va. 346, 352 (2011). There are three principal ways in which a circuit court abuses its discretion:
>
> > When a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones are considered, but the court, in weighing those factors, commits a clear error of judgment.
>
> "Thus, only when reasonable jurists could not differ can we say an abuse of discretion has occurred.' Sauder v. Ferguson, 289 Va. 449, 459 (2015).

Galiotos v. Galiotos, ___ Va. ___, ___ (June 3, 2021).

CONCLUSION

We find that the trial court did not abuse its discretion in permitting George to testify. Accordingly, the convictions here challenged are affirmed.

Affirmed.